415 A.2d 37

In re TESTAMENTARY TRUST CREATED UNDER the LAST WILL AND TESTAMENT OF LaVerne K. ISCHY.  Inter Vivos Trust Created By LaVerne K. Ischy and Donald C. Keister.

Appeal of the SCOTTDALE BANK & TRUST COMPANY, Formerly the Scottdale Savings & Trust Company, Testamentary Trustees Under the Last Will and Testament of LaVerne K. Ischy, Deceased, and Trustees Under the Inter Vivos Trust Created by LaVerne K. Ischy and Donald Keister.

Supreme Court of Pennsylvania.

Argued March 3, 1980.

Decided May 30, 1980.

72

David W. Cook, James R. Gaut, John W. Pollins, III, Hammer & Pollins, Greensberg (Sp. Counsel), for appellant.

Dominic Ciarimboli, Ralph Conrad, Greensburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

The Scottdale Bank & Trust Company, trustee, appeals from the denial of certain compensation for the administration of two trusts. The orphans' court refused compensation on the ground that appellant had waived its right to the disputed fees. Careful review convinces us that the record cannot support the orphans' court's conclusion and accordingly we reverse.

The present litigation began in October 1976 when appellee Lucile Keister Lindstrom filed four petitions in the Court of Common Pleas of Westmoreland County, Orphans' Court Division, challenging the administration of four separate

trusts and estates of which she is a beneficiary.[1] The question of compensation now before this Court arises from two of these petitions.

Petition No. 65–76–1699 concerned an inter vivos trust established in 1938 by Lucile's aunt, LaVerne Ischy, and Lucile's father, Donald Keister.[2] By the terms of the trust instrument the Scottdale Bank & Trust Company (hereafter Bank) succeeded Lucile's father as sole trustee upon his death in 1964.[3] In this petition Lucile alleged that she had only an illegible copy of the trust instrument and that her requests of the Bank for a certified copy of the trust instrument and for an accounting of the administration of the trust had all been denied. The petition prayed that the orphans' court issue to the Bank a rule to show cause why it should not provide Lucile with a certified copy of the trust

1. A separate civil action in equity, also filed at this time, was apparently consolidated with the orphans' court petitions. This action was brought against the Scottdale Bank & Trust Company and against Lucile's sister Marilyn Keister Kiefer and her sister's husband Raymond E. Kiefer. The latter is the president of the Scottdale Bank & Trust Company. The record does not reveal the exact nature of this action but no question relating to it is before us on the present appeal.

2. By item 4 of the trust instrument the trustee is to pay net income from time to time to Lucile or to some "proper person or institution" on her account until she attains the age of forty-eight. For the next year income is to be paid, in the discretion of the trustee, directly to Lucile. Finally, on her attaining the age of forty-nine, the entire trust estate is to go to Lucile. Appellee has apparently reached this age. In the event that she had not survived to age forty-nine, under the terms of the trust, all of appellee's rights would have succeeded to her sister Marilyn.

The trust instrument contains a spendthrift clause (item 1) and authorizes the trustee to invade trust principal in certain circumstances (item 6). The latter provision and certain others are not fully legible due to the poorness of the copy included in the record.

The trust instrument grants broad powers of investment and control to the trustee, authorizes him to seek the advice of counsel at the expense of the trust and frees him from liability for any action taken or omitted in good faith on the advice of counsel, but is silent concerning compensation.

3. This and other documents refer to appellant as the Scottdale Savings & Trust Company, the name under which appellant formerly did business.

instrument and with a complete accounting of the administration of the trust and why it should not be removed as trustee.

Petition No. 65–76–1698 concerned a testamentary trust established by the will of LaVerne Ischy.[4] This trust was established in 1961 and the Bank has been sole trustee at least since the death of appellee's father in 1964. In this petition Lucile alleged that, despite repeated requests, the Bank had failed to file any accounting of the administration of the trust and that petitioner had incomplete knowledge of trust assets. In addition, Lucile alleged that her sister Marilyn Keister Kiefer, who is also a beneficiary of the trust, and her sister's husband, Raymond E. Kiefer, who is president of the Bank, were exercising control over the Bank to appellee's detriment. See note 1, supra. This petition also sought a rule to show cause why the Bank should not file a complete accounting and why it should not be removed as trustee.

A rule to show cause was granted on both petitions in November 1976. In December the Bank, through its president Raymond E. Kiefer, filed separate answers denying all

4. This trust was funded by the bulk of LaVerne Ischy's money and intangible personal property. By the terms of the will testator's husband is given a life estate in the income of the trust and the trustee is authorized, in its discretion, to provide for his maintenance, support or care when necessary or advisable. On his death, or, in the event that he predeceased testator, $18,000 from the trust principal is to be distributed to the Bank, in trust, for specified religious purposes. At the same time, one-third of the remaining principal is to go outright to testator's brother Donald. The remaining two-thirds of principal is to remain in trust. Donald's two daughters, Lucile and Marilyn, are to receive equal income distributions at least semi-annually for life. The trustee is also authorized to invade principal in its discretion for the proper maintenance, comfort, support or care of either niece.

On the death of either niece, any children surviving that niece are to receive their mother's income, in equal shares, until reaching the age of twenty-one. At that time these children are to receive their mother's share of principal outright. In the event that a niece dies without children her interest is to go to the surviving niece or to that niece's children.

As in the case of the inter vivos trust, the trustee is given broad powers of investment. Again, however, the instrument makes no provision for the trustee's compensation.

charges and claiming that there was no evidence to support its removal as trustee.[5]

A hearing was held before the orphans' court in March of 1977. At the hearing Lucile's attorney placed on the record an agreement of counsel that the Bank would furnish to Lucile a full accounting of its administration of the various trusts and estates involved. The orphans' court instructed the Bank to supply these accounts within thirty days. They were apparently produced sometime in June.

Apparently without further court involvement, negotiations between the parties produced a Settlement Agreement, dated November 16, 1977, relating to all of appellee's court actions.[6] In the case of the inter vivos trust the Bank agreed to distribute all income accumulated to date to Lucile. It further agreed to exercise its discretion to invade principal for her benefit and to distribute that principal to her. In addition, the Agreement provided that the parties "will attempt to resolve the questions concerning details of the accounting submitted [concerning this trust] . . . as raised by counsel for [Lucile] . . . ." Record at 52a.[7]

The Agreement also covered possible distributions to Lucile from the testamentary trust. Here a dispute concerning the proper interpretation of the will required more elaborate

5. In response to the petition concerning the inter vivos trust, the Bank claimed that Lucile's copy of the trust instrument was identical to the one it possessed and that the Bank had already given Lucile complete information concerning the inter vivos trust. The answer to the petition concerning the testamentary trust claimed that the Bank had already made a full and complete accounting of the trust's administration. This answer denied that either Marilyn Kiefer or Raymond Kiefer were presently exercising control over the Bank and asserted that they were not proper parties to the proceeding.

6. The record contains an order of the orphans' court setting a hearing, at appellee's request, for October 26, 1977, but there is no indication that this hearing ever was held.

7. The trust principal is apparently composed, in part, of shares in certain family held partnerships. Thus the Agreement also provided that the parties "will attempt to resolve the questions of distributions from 'partnerships.'" Record at 52a.

provisions.[8] The parties agreed, however, to submit this dispute to the orphans' court and further agreed that, should the court permit termination of the trust, the Bank would distribute all accumulated income and all but a portion of trust principal to Lucile and her sister in equal shares. Again, this section of the Agreement expressly acknowledged that the "parties will attempt to resolve the questions concerning details of the accounting submitted [concerning this trust] as raised by counsel for [Lucile] . . . ." Record at 53a.[9]

By decree dated February 28, 1978, the orphans' court approved the Settlement Agreement in all respects. This decree also approved distribution of income and principal from the testamentary trust.[10]

On March 27, 1978, by a writing signed by all counsel, the parties agreed to proceed with distribution on March 31, 1978. This memorandum expressed their understanding of certain issues which were not covered in the prior Settlement Agreement and, of equal importance, expressed their

8. The dispute was "whether distribution upon the death of both Marilyn Keister Kiefer and Lucile Keister Lindstrom is to be made to [their children] . . . per capita or per stirpes." Record at 53a. The Agreement expressed the parties' understanding that if a per capita distribution was intended then no distribution of trust principal would be appropriate.

9. The Agreement made distributions from this trust subject to receipt from Lucile of proper reasons for invasion of principal for her benefit, and subject to approval by the Bank's Board of Directors, by the orphans' court and by Scott Lindstrom, Lucile's son, who has a remainder interest in the trust. As with the previous trust, the Agreement recited that the parties would attempt to resolve the question of distributions from "partnerships." See note 7, supra.

10. This approval expressly relied on (1) a release to be executed by Scott Lindstrom; (2) a letter stating Lucile's requirements for "maintenance, comfort, support and care;" and (3) the orphans' court opinion and decree dated February 9, 1978. The record does not reproduce or describe in any way the contents of this February adjudication. We may surmise, however, that it concerns the disputed meaning of the final distribution scheme of the testamentary trust. And, in light of the orphans' court's approval of principal distributions from that trust, we may further surmise that the court ruled that a per stirpital distribution was intended.

understanding that certain problems were as then still unsolved. For example, in this March 27 memorandum Lucile undertook to pay any brokerage fees incurred in the transfer of trust securities for distribution. But the memorandum expressly stated that the question of whether trust property should be used to compensate the attorneys who had represented the Bank or Marilyn and Raymond Kiefer was unresolved. No mention was made of compensation for the Bank as trustee. This memorandum expressly anticipated, however, that the Bank would provide further worksheets, before final distribution, showing receipts and disbursements from the trusts since March 1977. Finally, the memorandum, expressly anticipating possible further questions concerning the Bank's worksheets, required Lucile's attorney to raise any such questions before the time of distribution.

When the worksheets were submitted, apparently sometime in April, they included claims by the Bank for compensation for its administration of the two trusts. For the inter vivos trust the Bank claimed a fee on the distribution of accumulated income and a termination fee on principal. It also claimed a termination fee on principal for the testamentary trust. These claims totaled slightly over $4000.[11]

Lucile objected to these fees and the orphans' court set another hearing. In the interim trust assets were distributed according to the prior agreements, except for an amount sufficient to pay the contested fees. This amount has been placed in escrow.

At the hearing Lucile asserted that the Bank's failure to claim any fees in the accountings submitted in 1977 or in the Settlement Agreement of November 1977 constituted a waiver of these claims. Lucile also alleged that the fees were charged by the Bank as a result of animosity.

11. For the inter vivos trust the Bank claimed an income fee of $1,266.00 on income of $25,321.24 and a termination fee of $1,183.67 on principal of $49,295.24. For the testamentary trust the Bank claimed a termination fee of $1,571.55 on principal of $115,905.38. The total claims amounted to $4,021.28.

The sole witness at the hearing was a trust officer of the Bank. This officer testified to the general nature of the services performed for the trusts and to the methods used by the Bank to calculate the amount of claimed compensation. His testimony revealed that the Bank had charged fees on prior income distributions or had made periodic charges on income earned but not distributed from these trusts. Thus he explained that the income fee sought in the inter vivos trust was based on income accumulated since the time of a prior charge in January 1974, and that the absence of any income fee for the testamentary trust was because a fee had already been collected at the time of an income distribution in March 1978. The trust officer asserted that the fees claimed were reasonable and that the Bank had never intended to disclaim them.

On cross-examination appellee sought to substantiate her claim that the fees were included as an after-thought and for improper motives. The trust officer acknowledged that it was not until that April that the Bank contacted the Mellon Bank in Pittsburgh to obtain a suitable termination fee formula for these trusts. But the trust officer maintained both that these fees were reasonable and that failure to claim them in the earlier accountings or during the prior negotiations should not constitute a waiver. The only other portion of the record which supports appellee's claim of improper motive are several remarks of the orphans' court judge that the case was one of "bad blood." [12]

12. Toward the end of the hearing the following appears:
"BY THE COURT: . . . It appears to me there wasn't too much attention paid to these fees until . . . and I know that this settlement wasn't arrived at amicably; I know I had difficulty getting it settled up and it appears these fees were all a second thought and I will say it on the record. It was bad blood and I don't like the looks of this and I'm going to say it on the Record. I mean there are hesitation on some of these answers and I'm going to be frank about it. . . ."
Record at 109a–110a. Shortly thereafter the following appears:
"BY THE COURT: There is bad blood here. I want this on the Record. I know there is bad blood here. It was that way when we started and after it was moving and supposedly settled we had to push and repush to get it done. I have my suspicians [sic] of what

By decree dated October 10, 1978 the orphans' court disallowed the Bank's claims for compensation. The court acknowledged that the fees claimed were reasonable. Moreover, the court indicated its belief that existence of animosity between a trustee and a beneficiary should not extinguish the trustee's right to reasonable compensation. The court ruled, however, that the Bank's failure to include the fees in the accounting it presented in 1977, in the Settlement Agreement of 1977 or in the memorandum of counsel of March 27, 1978 resulted in a waiver of its claim. Exceptions to the decree were taken, but they were dismissed and the decree was made final on May 16, 1979. This appeal followed.[13]

We begin with the established principle that fiduciaries in this Commonwealth are entitled to fair and just compensation for services they perform, *Williamson Estate*, 368 Pa. 343, 82 A.2d 49 (1951); *Kennedy Trust*, 364 Pa. 310, 314, 72 A.2d 124, 126 (1950), a rule required by statute, 20 Pa.C.S. § 7185.[14] Thus the absence of any compensation

the problems are and where, but that is neither here nor there. We're going to do what we believe is right."
Record at 114a.

13. Appellee moved to quash this appeal. By order dated September 12, 1979 we reserved decision on this motion until after oral argument on the merits. At oral argument the motion to quash was withdrawn.

14. This statute provides in relevant part:
"§ 7185. COMPENSATION
(a) When allowed.—The court shall allow such compensation to the trustee as shall in the circumstances be reasonable and just, and may take into account the market value of the trust at the time of the allowance, and calculate such compensation on a graduated percentage.
(b) Allowed out of principal or income.—Neither the fact that a fiduciary's service has not ended nor the fact that the trust has not ended shall be a bar to the fiduciary's receiving compensation for his services out of the principal of the trust. Whenever it shall appear either during the continuance of a trust or at its end, that a fiduciary has rendered services for which he has not been fully compensated, the court having jurisdiction over his accounts, shall allow him such original or additional compensation out of the trust income or the trust principal or both, as may be necessary to compensate him for the services theretofore rendered by him. The

provision in a trust document or the absence of any independent compensation agreement is not a bar to compensation. *Reed Account*, 467 Pa. 371, 376, 357 A.2d 138, 140–41 (1976); *Bosler's Estate*, 161 Pa. 457, 462, 29 A. 57, 60 (1894); Restatement (Second) of Trusts § 242 (1959).[15] Rather it is presumed that fiduciaries will receive reasonable compensation for their services.

To be sure, the compensation claimed by a fiduciary must be based on services actually performed and not on some arbitrary formula. *Breyer Estate*, 475 Pa. 108, 119, 379 A.2d 1305, 1311 (1977) (burden on fiduciary to show reasonableness of claim and absence of prior payment). And, at least in the absence of a prior valid compensation agreement, when claims for compensation are presented to the orphans' court it has always been the responsibility of the auditing judge to allow only such fees as are reasonable given the nature and extent of the fiduciary's service. Nevertheless, the determination of what compensation is fair and just in a particular case is a task we have consistently and necessarily left to the sound discretion of the chancellor. Id., 475 Pa. at 119, 379 A.2d at 1311; *Thompson Estate*, 426 Pa. 270, 278, 232 A.2d 625, 629 (1967); *Wallis Estate*, 421 Pa. 104, 110, 218 A.2d 732, 735 (1966).

provisions of this section shall apply to ordinary and extraordinary services alike.

(c) Compensation prescribed by will or other instrument.— Where the compensation of a fiduciary is expressly prescribed either by provisions of a will or deed of trust or other instrument under which he is acting or by provisions of an agreement between him and the creator of a trust, nothing in this section shall change in any way the rights of any party in interest or of the fiduciary."

\* \* \* \* \* \*

We have previously held that the provisions of this section apply to trusts established prior to its enactment. *Breyer Estate*, 475 Pa. 108, 113, 379 A.2d 1305, 1308 (1977); see *Ehret Estate*, 427 Pa. 584, 235 A.2d 414 (1967).

15. Of course this Court has given full effect to agreements, otherwise valid, fixing the rate of compensation for fiduciaries. See *Duncan Trust*, 480 Pa. 608, 391 A.2d 1051 (1978); *Breyer Estate*, supra; 20 Pa.C.S. § 7185(c).

In the present case the orphans' court found the amount of compensation claimed by the Bank to be reasonable. The beneficiary does not contest that finding, and we see no basis for disturbing the orphans' court determination. Thus, given the established presumption that fiduciaries are entitled to compensation for their services, and given the uncontested finding that the compensation claimed is reasonable, the burden must then naturally fall on the beneficiary contesting the claim to demonstrate why it should not be allowed. Cf. *Lerch Estate*, 399 Pa. 59, 68, 159 A.2d 506, 511 (1960); *Bard's Estate*, 339 Pa. 433, 437, 13 A.2d 711, 713 (1940). We hold that the beneficiary here has not met that burden.

■ Appellee's sole argument is that the Bank has waived any right to its claims.[16] A fiduciary may waive its right to compensation. *Fitzgerald's Estate (No. 2)*, 252 Pa. 575, 97 A. 937 (1916); *Scull's Estate*, 249 Pa. 57, 94 A. 476 (1915); Restatement (Second) of Trusts § 242 (1959); id. comment j.

**16.** The orphans' court did not rule and appellee does not argue that the present claims should be disallowed because the Bank has breached any fiduciary duty to her. Compare *Lewis Estate*, 349 Pa. 455, 461, 37 A.2d 559, 562–63 (1944); *Commonwealth Trust Company Case*, 331 Pa. 569, 582, 1 A.2d 662, 668 (1938); *Weinstein v. Union Trust Company of Pittsburgh*, 313 Pa. 280, 169 A. 101 (1933); *Kline's Estate*, 280 Pa. 41, 49, 124 A. 280, 283–84 (1924); Restatement (Second) of Trusts § 243 (1959). Although appellee's petitions before the orphans' court alleged that her relatives have controlled the trustee Bank to her detriment and that the Bank had withheld information from her, no evidence to support these claims was produced and the orphans' court made no findings on these issues.

Neither does appellee now urge that the claimed compensation should be denied because of the Bank's alleged animosity toward her. And except for the remarks of the orphans' court, see note 12, supra, nothing in this record demonstrates the existence of any such animosity. It should be noted, of course, that these remarks do not necessarily demonstrate that any animosity between the present litigants is the responsibility of only one party. Indeed these comments may well reflect only the court's efforts to induce all parties to reach a settlement. Moreover, the orphans' court did not rely on any finding of animosity. Even assuming a record from which we might properly attribute to this corporate fiduciary the sort of personal hostility alleged, we agree with the orphans' court that it is far from clear that such ill-will alone, without some further showing, would rise to such a breach of trust as to justify the disallowance of otherwise reasonable compensation.

Indeed, this Court has indicated that, depending on the circumstances of the case, a fiduciary may waive such claims not only by express disavowal but also by conduct or omission. *Taylor's Estate*, 239 Pa. 153, 167, 86 A. 708, 713 (1913). For where a fiduciary either by words or deeds creates a basis for a reasonable belief that compensation will not be sought, a beneficiary should be entitled to rely on such a belief.

In the present case, however, the orphans' court found a waiver by omission due solely to the Bank's failure to present its claims for compensation until its production of final worksheets in April 1978. Nevertheless, our research reveals no prior case in which the mere failure to express an intention to collect compensation in the future has been sufficient to support a finding of waiver. We believe no such finding is warranted here. Although our review of findings of fact made by the orphans' court is limited to consideration of whether they are supported by competent and adequate evidence, *McCrea Estate*, 475 Pa. 383, 386–87, 380 A.2d 773, 775 (1977), we are under no such limitation when we must review the legal conclusions an orphans' court has derived from those facts. Here, clearly, the orphans' court's finding of waiver is a conclusion of law, subject to our full review. Given the established presumption that all fiduciaries are entitled to reasonable compensation for their services and given the on-going nature of the negotiations in this case, the evidence does not, in our view, support the conclusion that the Bank has waived its claims.

The record of the initial orphans' court hearing in March 1977 makes clear that the accountings which the Bank then agreed to produce for appellee were intended simply to inform her of the current state of trust administration. They were not to be presented to the orphans' court, and apparently never have been; they were not to be formal, much less final accountings of either trust. Indeed, the record gives no indication that at the time of the 1977 hearing immediate termination of either trust was contemplated. Thus the Bank's omission of any claim for a termination fee on either trust is hardly remarkable.

Nor is the omission from these accountings of any claim for income fees evidence that the Bank intended to waive those fees. To the contrary, the record establishes the Bank's uncontested prior practice of claiming income fees on both trusts and suggests that these claims had been assessed only at the time of income distributions or, at intervals, on accumulated but undistributed income. There is no indication that any income was distributed or was meant to be distributed at the time of these 1977 accountings or that a charge on accumulated income was then due. Failure to include a claim for income fees at that time is hardly surprising, much less is it convincing evidence that the Bank intended to abandon its established practice.

So too the omission of any compensation claims in either the Settlement Agreement of November 1977 or the memorandum of March 1978 does not support a finding of waiver. Rather, both of these writings were clearly only working agreements in the continuing effort to obtain a negotiated settlement of appellee's claims. Both of these writings contain provisions plainly indicating that neither party intended either agreement to be an integrated statement of all obligations. For example, as already indicated, every section of the Settlement Agreement expressly provides that the parties "will attempt to resolve" problems of distribution. And, indeed, the variety of issues covered in the March 1978 memorandum but not provided for in the Settlement Agreement demonstrates the incomplete and undetailed nature of the 1977 Agreement. Thus this Agreement makes no mention of which party will pay brokerage fees on securities to be distributed or which party will pay the Bank's attorneys fees. Yet the 1978 memorandum shows that by that time appellee had agreed to pay the brokerage charges but that the parties had still not resolved the question of counsel fees.

Finally, the March 1978 memorandum specifically and expressly anticipated that further questions concerning the settlement might arise from the final worksheets presented by the Bank. This is precisely what occurred. Importantly,

this claim for compensation came before any distribution of the assets of either trust. Clearly it came at a time when the parties were still negotiating the complete extent of their obligations. A waiver may not be found simply where the fiduciary has not demanded compensation before the usual time for its payment has occurred. In these circumstances we do not believe that mere prior silence of the Bank supports the conclusion that it had renounced its established right to reasonable compensation for its services.

Decree reversed. Each party to pay own costs.