467 A.2d 1175

In re ESTATE OF Helen BROJACK, Deceased.

Appeal of William BROJACK and Peter Brojack, Jr., Heirs.

Superior Court of Pennsylvania.

Argued March 22, 1983.
Decided Sept. 23, 1983.
Reargument Denied Dec. 5, 1983.
Petition for Allowance of Appeal Denied June 27, 1984.

David L. Kurtz, Moscow, for appellants.

Patrick John Mellody, Scranton, for Brojack, participating party.

P. Timothy Kell, Scranton, for Warnetsky, et al., participating party.

Before HESTER, JOHNSON and POPOVICH, JJ.

JOHNSON, Judge:

This is an appeal from an order dismissing appellant-William Brojack's objections [1] to the first and final account of the estate of Helen Brojack, deceased (hereinafter referred to as the decedent). The decedent was the mother of William Brojack (Bill), Peter Brojack, Jr. (Peter), Martha Warnetsky (Martha), Eleanor Hilavaty (Eleanor) and Paul Brojack (Paul). The five individuals named above are the sole beneficiaries under the will of the decedent; each was to receive an equal share. Paul was named as executor.

The decedent died on November 27, 1978. Family meetings were held on January 31, 1979 and March 16, 1979. Various estate assets were sold to the various beneficiaries and releases were executed as to most of such assets. Bill was deeded the family homestead (known as the farm) after the second meeting. Before the second meeting he had received title to a car which had been owned by American Silt Processing Co., a corporation owned by decedent.[2] No release was signed as to the car. Peter purchased an antique Cadillac from his mother's estate after the second meeting. Martha was to purchase two lots from the estate for her daughter; the record does not indicate whether this transaction was completed. The heirs agreed at the first meeting to reimburse Bill for his share of the proceeds of a

---

1. Peter Brojack, Jr. did not join in the filing of the objections, but did join in the objections when the estate was called for an audit of the first and final account. Hereafter Bill and Peter will be referred to as appellants.

2. Decedent owned 100 of the 101 shares issued by the corporation. Paul owned the remaining share.

sale of property, known as the Keyser Avenue property, which had been transferred to nonrelatives nine years earlier. Bill had allowed his father, Peter, Sr., decedent's husband (who had predeceased decedent), to retain such monies for his own use. Bill was paid by means of two checks, both dated before, though not processed until after, the second meeting. Subsequent to the second meeting, the executor entered into an agreement of sale with Martha for the transfer of American Silt. This sale has not been consumated due to the dispute which is the center of this appeal.

Appellants, Bill and Peter, complained that the sale price for American Silt is inadequate. The executor argues that the sale of the company was part of an oral family settlement agreement, binding on all the heirs. Appellees, Martha and Eleanor, likewise contend that a valid family agreement exists and that it should be enforced. The Orphans' Court found that a comprehensive family agreement exists which included the sale of American Silt to Martha. The chancellor dismissed the objection to such sale [3] and hence this appeal.

> "[I]n reviewing the decision of the orphans' court, our task is to assure that the record is free from legal error and to determine if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence." *Cohen Will*, 445 Pa. 549, 550, 284 A.2d 754, 755 (1971); *Garges Estate*, 474 Pa. 237, 378 A.2d 307 (1977); *Holtz Will*, 422 Pa. 540, 222 A.2d 885 (1966); *Hunter Will*, 416 Pa. 127, 205 A.2d 97 (1964).

*In Re Estate of McCrea*, 475 Pa. 383, 386–87, 380 A.2d 773, 775 (1977) (brackets in original); quoted in *In Re Estate of Damario*, 488 Pa. 434, 437, 412 A.2d 842, 844 (1980). While our review of the Orphans' Court findings of fact is limited

---

**3.** Numerous other objections were also raised, and various petitions and motions were filed. Eleanor also filed objections as to the sale of the farm. The lower court limited its ruling to whether an agreement existed among the heirs as such would be determinative of many of the complained of matters.

to considering whether they are supported by the record, we are not so restricted in reviewing the legal conclusions derived from the facts. *In Re Ischy Trust, Etc.*, 490 Pa. 71, 415 A.2d 37 (1980). A finding of consent to or affirmance of a family agreement is a mixed question of fact and law which must be reviewed in light of the particular circumstances of the particular case. See *Zampetti v. Cavanaugh*, 406 Pa. 259, 176 A.2d 906 (1962).

In the current case the chancellor made the following findings. The decedent's five children were represented at the two family meetings; due to health reasons Peter was represented by his wife, Helen (not to be confused with decedent), and a son at both meetings. At the first meeting the executor provided a full and substantial disclosure of the estate assets, including documents pertaining to American Silt. Appraisals and alternate values were provided; Peter's wife, Helen, delivered such papers to him after the first meeting. After discussion at the first meeting, agreement was reached regarding the sale of various assets to the various beneficiaries, including American Silt to Martha. Agreement was also reached as to the payment to Bill of his claim for a share of the sale proceeds of the Keyser Avenue property. Pursuant to such oral agreement, various assets were transferred.

At the meeting of March 16, 1979, the attorney for the estate was present and had documents for the transfer of American Silt. However, at the executor's request, the papers were not signed at that time so that changes could be made in the allocation of the purchase price. No objection was raised, at either meeting, to the sale of American Silt. The court found that it was not until June 1979 that Bill offered a higher price for American Silt, after he had already received and accepted benefits of the family agreement.

Family settlement agreements are favored in this Commonwealth because they are an attempt to avoid potentially divisive litigation. The existence of such agreement must be shown by clear and unambiguous evidence; the

agreement must be binding on all parties. *In Re Estate of McCrea, supra; In Re Estate of Stancik*, 451 Pa. 20, 301 A.2d 612 (1973); *In Re Estate of Sumney*, 425 Pa. 224, 228 A.2d 915 (1967). However, where a fair and valid agreement is present it will be upheld whenever possible; in the absence of fraud the agreement is binding even though based on an error of law. *Id.* In this current appeal, after having reviewed the almost 700 pages of testimony, and numerous exhibits, we find that the record supports the chancellor's conclusion that an integrated agreement existed, which included the sale of American Silt. We set forth only a brief summary of the pertinent testimony.

■ Paul testified that he handed out at the first meeting various documents to all present; included were various financial statements regarding American Silt and appraisals of the assets of the estate. The balance sheet of American Silt showed a $94,000.00 debt owed to the decedent.[4] Martha stated she would pay book value[5] for the company. No one objected to the sale. Bill thought the price was too *high*. Helen Brojack, Peter's wife, did not tell anyone that she had no authority to act for her husband. At the second meeting when the execution of the sale agreement for the sale of American Silt was postponed, all present were asked if they had any objections to any of the sales. No objections were expressed. Paul thought that a firm family agreement existed.

Paul further explained that an 8 acre tract had been omitted from the American Silt documents and the inventory because the realtor believed the parcel was of no value, except to American Silt. He did not realize the omission of the parcel from all the documents until after the second family meeting when Bill brought the subject up after the

4. This debt represented loans made to the corporation by decedent and her husband (who had predeceased her) and rent for the realty owned by decedent upon which the corporation did business.

5. The unaudited balance sheet showed assets of $70,575 and liabilities (in addition to the note owed to decedent) of $23,375, for a book value of approximately $47,000. When the real estate was added thereto, the book value became approximately $62,000, Martha's offer.

agreement had been executed by Paul. At that time he (Bill) suggested the tract be valued at $1,000. Paul further testified that he had explained at the family meetings that the $94,000 debt owed to the decedent was to be forgiven. No one objected. The sales agreement was signed sometime after the second family meeting.[6] No objections were voiced to the executor until July, 1979.

Martha testified that Bill told her at the first meeting that the sale price for the business was too *high*. She responded that she was willing to pay the book value. No one else expressed any interest in the company. At the second meeting everyone was ready to sign the agreement although Paul desired changes. There were no objections to the sale at this time. The $94,000 was discussed. Martha subsequently signed the agreement and arranged for financing. She testified that all agreed to pay Bill for the sale of the Keyser property to avoid any dispute even though it was questionable that the estate was liable for it. She believed that a family agreement had been reached.

Eleanor testified that everyone at the first meeting was provided with copies of the various documents. Paul reviewed everything. Bill thought the price listed for American Silt was too *high*, but Martha was willing to pay it. At the second meeting no one else expressed any interest in the company and she thought everything was resolved. Everyone, including Bill, had a chance to look at the agreement and everyone was ready to sign it. Peter's wife never stated that she would have to discuss matters with her husband. Eleanor understood that selling the farm and the company to members of the family would result in less money for the estate, but for the sake of family harmony she agreed and thought everyone else had also.

**6.** The executor signed the agreement sometime in May of 1979. Martha was not sure when she signed it. The Agreement was dated July 11, 1979. Apparently, the agreement was delayed by Martha's attorney. While appellants place a great deal of emphasis on the date of the written agreement, we find it unnecessary to determine the exact date, as we find a family agreement existed.

Helen Brojack, Peter's wife, stated that she informed those at the meeting that she would have to consult with Peter, before she could agree to anything. She claimed that she did not receive all the appraisals. Her son, after the first meeting, told Paul that the sale price for the farm was too low. Her husband, Peter, called Paul the day after the first meeting to oppose the sale of American Silt and to offer to buy it himself. At the second meeting no objections were raised to the sale of American Silt. Helen did not see the sales agreement at the second meeting and there was no discussion of the sale at that time. She did not realize that the sale of the farm was contingent upon the sale of the company to Martha.

Peter admitted that he did not object to the sale of American Silt until after July 11, 1979. He claimed that he called Paul the day following the first meeting, offered $65,000 for American Silt and was told that there were too many liens against the business but was not told that he could not buy it. He contended that the sale price was inadequate as the machinery was worth more; yet, he had not been on the business premises for over twenty years. Peter was on good terms with Bill but not with his other siblings.

Bill's testimony consisted of the following. He was unaware of the $94,000 debt of American Silt owed to the decedent. He stated that he had not received the balance sheet for the corporation; though, subsequently he admitted he may have, but he was concentrating on the farm at the first meeting. He claimed that he had not received all the appraisals, but he was aware of the three sets of appraisals. He contended that no agreement could be reached at the first meeting because Helen stated she had to consult with Peter. He stated that he had not agreed at the first meeting to the sale of the lots to Martha's daughter. He claimed that Paul stated that any reduction to the estate due to family agreements (farm, and $16,000 Keyser Avenue claim) would require a proportional increase in the price of American Silt.

At the second meeting he was aware that an agreement was to be signed, but was unaware of what the agreement was for. He did not inquire; there was no discussion of American Silt.

On June 14, 1979, Bill, through his attorney, and without clearly identifying himself as the interested party, offered $100,000 for the company. He did not receive a response but was later told that there was a preexisting sales agreement. Bill testified that he had asked Paul a lot of questions about American Silt, that he knew the inventory was worth more; that he knew the company and knew the figures of the company. Yet he admitted that he did not know who was running the company and had not done any hauling for or business with the company for a couple of years. Nor had he reviewed the company books until after this controversy arose. At one point he claimed he performed his own inventory of the company between the first and second family meetings; at another time he claimed it was conducted after the second meeting. He discussed it with Paul thereafter. While he did not object at the second meeting because of the omitted 8 acres, he did object before closing on the farm, but after everyone had signed the release.

We find that competent and adequate evidence was presented to the Orphans' Court. Without reciting all the testimony reviewed above, the record demonstrates that adequate disclosure was made; the various transactions were discussed and no one timely objected to the American Silt transaction.

 Our holding here is in agreement with that of the Supreme Court's in *In Re Hammer's Estate*, 389 Pa. 78, 132 A.2d 275 (1957).[7] In *Hammer*, as in the current case, only part of the total agreement was reduced to writing. Nonetheless the whole agreement was enforceable. Even an agreement that is entirely oral, if properly proven, is

7. The Supreme Court, by per curiam order, affirmed on the opinion of the Orphans' Court. Our discussion above refers to the Orphans' Court opinion which was reprinted at the above citation.

valid. *Holland v. Hand,* 317 Pa. 70, 176 A. 430 (1935). While any disagreement could have been avoided by a comprehensive writing instead of the asset by asset method employed here, an oral agreement will be upheld when clearly established. While even a brief review of the record clearly demonstrates that the parties' recollections of events are irreconcilable, it was within the province of the chancellor to weigh and assess the veracity of the testimony as he had the opportunity to hear and observe the demeanor of the witnesses. *Stauffer v. Stauffer,* 465 Pa. 558, 351 A.2d 236 (1976); *Sorokin v. Krasner,* 289 Pa.Super. 324, 433 A.2d 88 (1981). In light of the inconsistencies, changes of testimony, uncertainties and lapses of memory appearing in the testimony of the exceptants' witnesses, we find that the Orphans' Court's findings are "not predicated upon capricious disbelief of competent and credible evidence." *In Re Estate of Cohen, supra.*

The chancellor found the proponents of the agreement to be worthy of belief, in particular the testimony of Eleanor. She testified that even though the sale of the farm and American Silt would result in less money for the estate then a public sale would produce, she agreed to such in the interest of family harmony. Her understanding was that everybody concurred in the sales. As Eleanor did not wish to purchase any estate assets, and she realized such sales would reduce her share, she not only testified against her pecuniary interest but agreed to sales against her pecuniary interest. Such testimony may be given additional weight. *Hammer's Estate, supra.*

Furthermore, a family settlement may arise by presumption from the parties' conduct, or failure to act. *In Re Edelman's Estate,* 336 Pa. 4, 6 A.2d 511 (1939). Here no objections were voiced to the anticipated sale of the business, even when the sales agreement was to be signed. In light of the fact that other assets had been sold and Bill's Keyser Avenue claim satisfied, it was reasonable to presume assent. In such a situation, equity will not permit a beneficiary of an agreement, who has already received the

benefits of the agreement, to object to the remaining executory provisions of the agreement. Bill and Peter having benefited from the respective sales will not now be heard to complain. *Zampetti v. Cavanaugh, supra. In Re Brereton's Estate*, 388 Pa. 206, 130 A.2d 453 (1957); *Patterson v. Dushane*, 137 Pa. 23, 20 A. 538 (1890).

Appellants argue that a family agreement is not effective unless consented to and binding on all concerned. *Estate of Allen*, 488 Pa. 415, 412 A.2d 833 (1980); *In Re Little's Estate*, 403 Pa. 534, 170 A.2d 106 (1961). However, they misconstrue the chancellor's findings. The Orphans' Court did not hold that Bill's and/or Peter's consent was unnecessary, but instead found that they had consented. Unlike the situation in *Allen*, where the record was void of any such consent of some of the beneficiaries, here the record supports the finding of consent. While Peter was not present at either of the family meetings, he was represented by his wife and a son. His wife admitted that she informed him of the content of the first meeting at which the sale of American Silt was proposed. Peter admitted that he did not direct his wife to voice his objections. Bill was present at both meetings at which the sale was discussed, but voiced no objections. In light of the above discussion and the particular facts of this case we find the chancellor could properly find consent by all parties.

Appellants further argue that the Statute of Frauds, 33 P.S. § 1, prohibits this court from enforcing the alleged family agreement. They contend that for a family agreement concerning real property to be binding it must be in writing. The executor contends that appellants' acquiescence estops them from now raising such claim after they received the benefits thereof. He also contends that under the Pennsylvania Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. § 3351, the executor does not need the signature of all heirs to transfer realty. Appellees Martha and Eleanor further contend that the statute of frauds was not specifically pleaded below and therefore was waived.

█ The Statute of Frauds must be raised in a responsive pleading. *Shoup v. Shoup*, 469 Pa. 165, 364 A.2d 1319 (1976). In the current case the claim was not specifically raised in the objections to the account, however it was raised at some point before the court and was addressed by the court.[8] Due to the multiplicity of motions and petitions, all of which are not before this court for review, we will assume this claim was preserved.

█ However, we find it unnecessary to determine in this appeal whether the Statute of Frauds may prevent the enforcement of an oral family agreement concerning the sale of realty to an heir,[9] as equity demands the agreement be enforced. Specific evidence that would make recission of an oral contract inequitable and unjust will take such contract outside of the Statute of Frauds; partial performance, which has benefited the party invoking the statute, will in appropriate circumstances, bar the invocation of the rule. *Eastgate Ent., Inc. v. Bank & Trust Co. of Old York Rd.*, 236 Pa.Super. 503, 506, 345 A.2d 279, 280–81 (1975); *Lehner v. Montgomery*, 180 Pa.Super. 493, 496–97, 119 A.2d 626, 628 (1956). Having found above that a fair agreement existed and both appellants have benefited from the favorable provision of such agreement, equity required that they abide by the remaining provisions of it. Therefore the Statute of Frauds will not be applied to the facts of this case.

Appellants' final claim is that the alleged agreement should be invalidated because of the executor's conflict of interest and failure to make full disclosure. While appellants' allegation of conflict of interest would be more appro-

8. The claim was raised in appellants' brief filed in opposition to the executor's request to sell American Silt.

9. *Hill v. Houpt*, 292 Pa. 339, 141 A. 159 (1928), relied on by appellants held that the oral provisions of a family agreement were void as to realty.

priate in considering the removal of the executor, we will address it briefly.[10]

Appellants contend that as accountant for American Silt and its sole surviving stockholder,[11] Paul breached his duty to provide full disclosure. First, we must note that Paul was placed in the alleged conflict of interest by the decedent; she appointed him accountant for the company and named him executor.[12] Therefore, the appellants' implication of self-dealing does not control the resolution of this appeal. See, *In Re Steele's Estate*, 377 Pa. 250, 103 A.2d 409 (1954); *In Re Flagg's Estate*, 365 Pa. 82, 73 A.2d 411 (1950). The agreement may not be set aside absent fraud. *Estate of Sumney, supra; Hammer's Estate, supra; Fry v. Stetson*, 370 Pa. 132, 87 A.2d 305 (1952).

All of appellants' claims of nondisclosure simply are not supported by the record or do not amount to fraud. They contend that the executor failed to obtain an independent valuation of the business and instead relied on the book value. Such was obvious from the documents distributed and the discussions that ensued. Many of the documents dealing with American Silt indicate that they were unaudited and for internal use of the corporate entity. Additionally, there was a disclaimer indicating that the accounting firm may not be completely unbiased. Accepting the executor's testimony, as apparently the court below did, an independent audit was not performed because the family members thought it was unnecessary and would be expensive. Had appellants been dissatisfied with this family consensus, they nonetheless remained silent, nor did they obtain their own appraisal.[13]

10. A petition to remove and surcharge the executor was filed in the Orphans' Court; such is not before this court.

11. See footnote 2; supra.

12. Paul also acted prior to the estate dispute as accountant for Bill's business.

13. Bill had obtained his own appraisal of the farm.

Omission of the eight-acre tract was raised after the second family meeting and explained. An independent realtor found it to be of little if any value except when transferred with American Silt. Appellant, William Brojack, himself, placed a value of $1,000 on it. As both appellants claim to have been familiar with the company, at least in the past, we find no fraud in this failure to include a portion of the real estate.

The $94,000 debt was listed and discussed extensively. It was agreed that it would be forgiven so that the company could be sold.

One item neither listed nor explained prior to this dispute was a $2,000 security deposit held by a utility company in the name of American Silt's predecessor. Paul testified he was unaware of such at the time of the family meetings. Due to its relatively small value and the explanation for its nondisclosure, such omission does not amount to fraud.

A final item which appellant makes reference to is the executor's request to sell an asset of the business. We extract from the record that, sometime after the family meetings, a market developed or, became known, for a previously valueless substance located on the company's premises. The potential value of such substance greatly exceeded the price due to be paid by Martha. As there is no evidence that the executor was aware of such value at the time the agreement was entered, hindsight will neither allow us to impose a duty to disclose what one is unaware of, nor allow us to find fraud in concealing what one does not know.

Order affirmed.

POPOVICH, J., concurs in the result.