J-A12034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LORRI BEAVER, ADMINISTRATRIX OF THE ESTATE OF KENNETH BEAVER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| LOGAN POWELL, MIKELO, INC., BULL RUN INN, INC., REGEN YODER, IAN KEFER, JOSEPH DEMETRIO MORALEZ, TOWNE TAVERN, INC. AND KENNETH BEAVER, JR. | : | No. 1091 MDA 2020 |

Appeal from the Judgment Entered August 20, 2020
In the Court of Common Pleas of Union County Civil Division at No(s):
16-0324

BEFORE:  LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED AUGUST 02, 2021**

Lorri Beaver ("Mother"), as Administratrix of the Estate of Kenneth Beaver ("Beaver" and the "Estate"), appeals from the judgment directing that the proceeds from Beaver's wrongful death action be equally divided between Mother and Kenneth Beaver, Jr. ("Father").  We reverse.

Beaver was born in January 1994 to Mother and Father in California. Mother and Father separated in 1995 and divorced in 1999.  After the divorce, Mother obtained an Order in child support in California against Father, which remained in effect until Beaver's eighteenth birthday in 2012.

Father and Beaver visited occasionally between the separation and the divorce, though Father was not permitted to be alone with Beaver.  Beginning

in 2000, after Father married his second wife, Kathy Kinyon ("Kinyon"), Beaver engaged in regular visits, including overnight visits, with Father and Kinyon. During this time period, Father would give Beaver small toys and gifts. No visits occurred after the couple divorced in 2002. Following a period of time in 2004, during which Father could not be located, Beaver's sister, Michelle Beaver ("Sister"), located Father by identifying his car parked outside of a residence. Beaver visited Father and his then-girlfriend, Zara Vincent ("Zara"),[1] two times in 2004.

There were no visits between Beaver and Father between 2009 and 2013, and Beaver did not know where Father was living. In July 2013, Beaver randomly encountered Father and Zara. At the time, Father and Zara were homeless, and living in a car in the parking lot of a Wal-Mart in California. For several weeks after the encounter, Beaver and Father visited once or twice a week in the parking lot, or in parks or other public places. Father relocated to Pennsylvania in 2014, though he did not tell Beaver or Sister that he had relocated. Following the Wal-Mart visits in 2013, there were no visits between Father and Beaver.

In July 2015, Mother paid for Beaver to travel to Pennsylvania for a family reunion on Mother's side of the family. On July 5, 2015, while visiting Father with Sister, Beaver told Father and Father's parents that he was

---

[1] Father and Zara (now Zara Beaver) married in 2015, after Beaver's death. N.T., 9/24/19, at 74.

interested in moving to Pennsylvania and living with Father. Beaver then asked Father if he could spend the night at Father's house, and Father responded that Beaver would need to ask Zara for permission. Beaver became visibly angry, collected his belongings, and left Father's house in Sister's vehicle. According to Sister, when Beaver got into the vehicle, he said, "That's it. I'm done. No more[,]" and "No more. Never again."

About a week after Beaver's final visit with Father, Beaver suffered serious injuries outside of a bar in Lewisburg, Union County, and ultimately died on July 19, 2015. Mother subsequently filed a wrongful death action against several parties related to Beaver's death. Father was served with a copy of the Complaint, but did not participate in the wrongful death action. Following a settlement, the Estate filed a Petition seeking approval of the settlement and allocation of the proceeds of the wrongful death action. The Estate claimed that Mother was the sole beneficiary of the proceeds.

On October 10, 2018, Father filed a Petition for Intervention, asserting that he was a lawful beneficiary of the wrongful death proceeds. Following a hearing, the trial court entered an Order granting Father's Petition. Father filed a Petition seeking the appointment of an Administrator *Pro Tem*, to which the Estate filed a Response. The trial court held a hearing on Father's Petition in September 2019, and the parties each filed Proposed Findings of Fact, Conclusions of Law, and Memoranda. On March 31, 2020, the trial court issued an Opinion, Findings of Fact, and an Order directing that the wrongful

death proceeds be divided equally between Mother and Father. Both parties filed post-trial Motions, which the trial court denied after argument. On August 20, 2020, Judgment was entered in favor of Father.

Mother filed a timely Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.[2]

Mother raises the following issue for our review: "Whether the [t]rial [c]ourt erred in concluding that [Father] was a wrongful death beneficiary?" Brief for Appellant at 3.

Mother argues that Father was not a wrongful death beneficiary based on Father's limited, sporadic, and turbulent contact with Beaver prior to his death. *Id.* at 24-46. Mother asserts that the trial court failed to properly evaluate Beaver's actions regarding Father, and what those actions said about Beaver's relationship with Father. *Id.* at 27. Mother points to the years in which Father did not maintain a relationship with Beaver when Beaver was a child, even though Father lived in close proximity to Beaver, as evidence that Father lacked the intention to establish a relationship with Beaver prior to his

_____

[2] On February 21, 2020, and May 17, 2020, as this appeal was pending before this Court, Father filed two separate Applications to quash the instant appeal, arguing that Mother lacked standing to sue in her capacity as the Administratrix of Beaver's Estate. *See* Application for Relief, 2/21/20; Second Application for Relief, 5/17/20. We conclude that Father has waived this issue, as he failed to challenge Mother's standing before the trial court. *See Burke v. Independence Blue Cross*, 103 A.3d 1267, 1271 (Pa. 2014) (stating that challenges to a party's standing must be raised before the trial court or they are waived).

death. *Id.* at 28-29. Mother asserts that the trial court placed improper emphasis on Beaver's apparent statements in the final days of his life, *i.e.*, that he wished to relocate to be closer to Father in Pennsylvania, and instead should have placed more weight on Beaver's statements to Sister that he was "done" with Father. *Id.* at 40-45. Mother characterizes Beaver's relationship with Father prior to his death as "[a] child wanting a relationship with his father, to know who his father was, to know about his father's family[,]" but that such a desire "does not automatically translate into a child who intends to financially bless and benefit his father, especially a father who had been absent from his life for 17 of his 21 years." *Id.* at 45-46.

As this Court has explained,

[t]he findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. *In re Estate of Cornell*, … 486 A.2d 424, 425 ([Pa. Super. ]1984).

> This rule is particularly applicable "to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony." *Herwood v. Herwood*, … 336 A.2d 306 ([Pa. ]1975). In reviewing the [o]rphans' [c]ourt's findings, our task is to ensure that the record is free from legal error and to determine if the [o]rphan's [c]ourt's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. *In re: Estate of Damario*, … 412 A.2d 842 ([Pa. ]1980). However, we are not limited when we review the legal conclusions that [o]rphans'

[c]ourt has derived from those facts. ***In re: Ischy Trust***, … 415 A.2d 37 ([Pa. ]1980).

***In re Estate of Dembiec***, 468 A.2d 1107, 1110 (Pa. Super. 1983).

The Pennsylvania Wrongful Death Act provides, in relevant part, as follows:

> **(a) General rule.--**An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid duplicate recovery.
>
> **(b) Beneficiaries.--** … the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

42 Pa.C.S.A. § 8301(a), (b).

"The purpose of the Wrongful Death Act is 'to compensate certain enumerated relatives of the deceased for the pecuniary loss occasioned to them through deprivation of the part of the earnings of the deceased which they would have received from him had he lived.'" ***Berry v. Titus***, 499 A.2d 661, 664 (Pa. Super. 1985) (quoting ***Manning v. Capelli***, 411 A.2d 661, 664 (Pa. Super. 1985)); ***see also Linebaugh v. Lehr***, 505 A.2d 303, 304-05 (Pa. Super. 1986) (stating that the purpose of the Wrongful Death Act is to compensate the decedent's survivors for their pecuniary losses, rather than

the decedent's estate). "[O]nly those persons who stand in a family relation to the deceased are statutorily authorized to recover damages." **Berry**, 499 A.2d at 664 (quoting **Manning**, 411 A.2d at 254). A "family relation"

> [e]xists between parent and child when a child receives from a parent services or maintenance or gifts with such reasonable frequency as to lead to an expectation of future enjoyment of these services, maintenance, or gifts. The term "family relation" as thus used does not embrace its comprehensive definition, but is confined to certain phases of family relation between the persons named in the act. … Before there can be any recovery in damages by one in that relation for the negligent death of another in the same relation, there must be a pecuniary loss.

**Gaydos v. Domabyl**, 152 A. 549, 551-52 (Pa. 1930). Further,

> [t]he reasonable expectation of pecuniary advantage to one standing in the family relation may be shown in many ways, but more frequently through services, food, clothing, education, entertainment, and gifts bestowed. To be reasonable, the services and gifts must have been rendered with a frequency that begets an anticipation of their continuance; occasional gifts and services are not sufficient on which to ground a pecuniary loss.

**Id.** at 552 (citation omitted). In evaluating the amount that a parent would receive from the efforts of a decedent child, had he lived to adulthood, a court must look to "the parent's contribution, financial and otherwise, to the development of the child while he was living." **See Berry**, 499 A.2d at 665.

In **Smith v. Sandals Resorts International**, 709 F.Supp.2d 350 (E.D.Pa. 2010),[3] the United States District Court for the Eastern District of

---

[3] We note that the decisions of the lower federal courts and other states' courts may provide persuasive, although not binding, authority. **See Gongloff Contracting, L.L.C. v. Architects and Engineers, Inc.**, 119 A.3d 1070, 1078 n.6 (Pa. Super. 2015); **Huber v. Etkin**, 58 A.3d 772, 780 n.8 (Pa. Super. 2012), **appeal denied**, 68 A.3d 909 (Pa. 2013).

Pennsylvania confronted a similar issue. There, the decedent's father did not meet the decedent until he was eight years old, and visits were limited to family gatherings and sporadic monetary gifts after decedent turned seventeen years old. *Id.* at 355-56. Though the father increased his contact with decedent after he suffered the injuries that would eventually result in his death, the trial court determined that the father did not suffer a pecuniary loss, concluding that "allowing [the father] to benefit from [the decedent's death] would inequitably reward [the father] for limiting his role in decedent's life." *Id.* at 357, 359.

By contrast, in **Berry**, this Court determined that the mother of the fifteen-year-old decedent, who had recently divorced the father and was no longer living with the father and the decedent, still suffered a pecuniary loss and was entitled to wrongful death proceeds. **Berry**, 499 A.2d at 664. This Court pointed to the mother's contributions to decedent's care for the first fourteen years of his life and had relinquished her financial interest in the marital home for the decedent's benefit. *Id.* Accordingly, this Court concluded that the mother had an expectation of future enjoyment of her son's pecuniary relationship had he lived to adulthood, and she was entitled to wrongful death benefits as a result. *Id.* at 665.

In **In re Estate of Wolfe**, 915 A.2d 1197 (Pa. Super. 2006), this Court determined that a decedent's adult daughter was entitled to wrongful death benefits when the decedent visited with his daughter every weekend after the

decedent had divorced the daughter's mother; the decedent assisted with daughter's college tuition and expenses; the decedent furnished his daughter with a car; and the decedent spent time and visited with his grandchild after daughter gave birth. *Id.* at 1201-02. This Court determined that such acts established continuous past acts and pecuniary conduct which created a reasonable expectation that such acts would continue into the future. *Id.* at 1203.

In this case, the record indicates that Father's relationship with Beaver was sporadic and inconsistent. Father spent years at a time without reaching out to or visiting with Beaver; Father's and Beaver's relationship was acrimonious when Beaver was a teenager, including instances in which Beaver wanted to physically fight Father; Father did not know significant details about Beaver's life such as his fiancée, high school, career, or the date of his death; Father relocated across the country without informing Beaver; Father only provided one substantive gift to Beaver—a pair of shoes—when he was a child; Father had access to a cell phone but did not contact Beaver; and Father's only financial support provided to Beaver after 2002 was his court-ordered child support. *See* N.T., 9/24/19, at 18-19, 28-29, 41, 52-53, 58, 60, 78-80, 99-100. Additionally, Father testified that, despite loving Beaver, "[t]here were times throughout [Beaver's] life where [Father] didn't care for him as a person" because of Beaver's attitude towards Father. *Id.* at 42. Further, Sister presented credible testimony that, following Beaver's final visit with

Father, at which time Father required that Beaver ask Zara for permission to spend the night in his house, Beaver stated, "That's it. I'm done. No more," and "[n]o more, never again," specifically in reference to Father. *Id.* at 145-46.

Father's level of contact in Beaver's life falls far short of the beneficiaries in *Berry* and *Estate of Wolfe*. The mother in *Berry* had directly supported the decedent until a year before his death and relinquished her interest in the marital home to provide a better home for decedent. *Berry*, 499 A.2d at 665. The daughter in *Estate of Wolfe* maintained a close relationship with the decedent, including receiving regular gifts from decedent until his death. *Estate of Wolfe*, 915 A.2d at 1201-03. Here, Father provided few gifts to Beaver, and the visits between Father and Beaver, once Beaver reached adulthood, appear to have been spurred by a random meeting between Beaver and Father, and Beaver's pre-arranged visit to Pennsylvania. N.T., 9/24/19, at 22-23, 29, 37-38.

In light of these circumstances, the record does not support the trial court's determination that Father suffered a pecuniary loss from Beaver's death. Even considering the difficulty posed by Father's struggles in securing housing and employment, Father's ongoing contact with Beaver can be best described as sporadic and inconsistent, as opposed to a relationship grounded in a genuine belief, by either party, that it would continue into the future. Considering the totality of the circumstances, we conclude that the trial court

abused its discretion in determining that Father's contributions to Beaver occurred with such a reasonably continuous frequency to establish a pecuniary loss. *See Berry*, 499 A.2d at 665; *Gaydos*, 152 A. at 552.

Accordingly, we reverse the judgment entered by the trial court, and remand for further proceedings. The trial court is directed to award the wrongful death proceeds to Mother, in accordance with 20 Pa.C.S.A. § 2103.

Order reversed; case remanded for further proceedings consistent with this Memorandum. Superior Court jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2021