ESTATE OF LILLIAN L. HALPERN, DECEASED, BERNARD M. HALPERN AND IRVING J. HALPERN, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Halpern v. Commissioner
Docket No. 5413-92
United States Tax Court
T.C. Memo 1995-352; 1995 Tax Ct. Memo LEXIS 345; 70 T.C.M. (CCH) 229; July 31, 1995, Filed *345 Decision will be entered under Rule 155. A trust established for D's benefit under the will of her husband, H, provided for payment to her of income for life (and principal according to an ascertained standard) and gave her a testamentary general power of appointment. Distributions of trust principal were made to members of D's family, both before and after D, having suffered a stroke, was adjudged incompetent. Those distributions were not authorized by H's will or by court order. All living members of the family, including D, agreed, either personally or through custodians, to the distributions before D's incompetency; D did not agree, even through her guardians, to the distributions after her incompetency, but all the other members of the family did agree. Held, sec. 2038, I.R.C., does not apply to include any of the distributions in D's gross estate. United States v. Field, 255 U.S. 257 (1921), followed. Held further, a Pennsylvania court would not have returned to the marital trust the assets distributed to family members prior to D's incompetency, and those assets are therefore not included in D's gross estate under sec. 2041, I.R.C.Estate of Council v. Commissioner, 65 T.C. 594 (1975), *346 followed. Held further, a Pennsylvania court would have returned to the marital trust the assets distributed following D's incompetency, and they therefore are included in D's gross estate under sec. 2041, I.R.C.
Held further, assets transferred through the 1986 distributions, which occurred within 3 years of D's death, are not included in her gross estate under sec. 2035, 2038, or 2041, I.R.C., by virtue of that timing. For petitioner: Richard I. Halpern and Dale Hershey. For respondent: Julia L. Wahl. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency of $ 187,150 in petitioner's Federal estate tax. Respondent's amended answer increased the total deficiency to $ 517,595. After concessions by both sides, the issues for decision are whether distributions during the years 1982 through 1988 from the marital deduction trust under the will of Julius Halpern (the marital trust) are included in the gross estate of his wife Lillian L. Halpern (decedent) under one or both of sections 2038 and 2041 and therefore subject to Federal estate tax. All section references are to the Internal Revenue Code in effect as of May 17, *347 1988, the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. We hold that the distributions made in 1982, 1983, 1984, 1985, and 1986 are not included in decedent's gross estate and that the 1987 and 1988 distributions are so included. FINDINGS OF FACT At the time of filing the petition, petitioner's executors resided in Pittsburgh, Pennsylvania. Decedent's husband, Julius Halpern (Julius), died in 1962. Other family members who figure in what follows are their sons, Bernard M. Halpern (Bernard) and Irving J. Halpern (Irving); Bernard's wife, Ethelmarie A. Halpern; Irving's wife, Caryl A. Halpern; Bernard's children, Richard I. Halpern (Richard) and Eileen L. Lane (Eileen); Eileen's husband, Nicholas D.J. Lane; Eileen's children, Adam J.B. Lane and Erica B. Lane; Richard's wife, Barbara S. Halpern; Richard's children, Stephanie L. Halpern and Alexandra S. Halpern; and Irving's children, Stephen F. Halpern (Stephen) and Jeffrey D. Halpern (Jeffrey). These family members (the family donees) were the only recipients of the questioned distributions, except that some distributions were made to Eiriste Properties (Eiriste), an inter *348 vivos trust established by Julius for the benefit of his grandchildren, of which Stephen and Jeffrey were the sole beneficiaries in all years relevant to the case at hand. Julius' will named decedent, Bernard, Irving, and Julius' brother Alfred J. Halpern as trustees of the marital trust. Alfred died in 1975 and was replaced as trustee by Richard. Julius' estate claimed and was allowed the marital deduction under section 2056 for the assets of his estate transferred to the marital trust. The marital trust provision of Julius' will is as follows: I give, devise and bequeath to my Trustees, without deduction for any estate, inheritance or other tax, a portion of my estate the value of which shall be computed as set forth in paragraph (B) of this clause. Said portion of my estate shall be held by my Trustees, separately, IN TRUST to [sic] my wife during her life all the income of this trust and until her remarriage to pay or apply to her use out of principal, in any year in which the income is insufficient for this purpose, such an amount as when added to the income will exceed by $ 10,000.00 the aggregate of her income taxes, real estate taxes on her residence and the cost of proper *349 maintenance and repair of her residence; and in addition to pay or apply to her use at any time and from time to time during her life such part or parts of the principal of this trust even to the extent of all thereof as my Trustees may deem necessary or suitable for her comfortable maintenance and welfare in the event of illness or other emergency; and upon her death to dispose of the then remaining principal of this trust, if any, as she may appoint in any manner, outright or otherwise, and in favor of any appointee or appointees she may designate in her sole discretion; and I hereby declare said power to appoint to be exercisable by my wife in favor of her own estate or in favor of any others; and in default of such appointment, I give, devise and bequeath the then principal of this trust to my heirs determined in accordance with the Intestate Laws of the State of Pennsylvania.
Thus, Julius gave decedent a testamentary general power of appointment over the trust assets and provided that, if she failed to exercise that power, the trust assets would go to his heirs determined under the intestate laws of the State of Pennsylvania. By reason of that power, the assets of the marital *350 trust are includable in decendent's gross estate for Federal estate tax purposes. After Julius' death in 1962, the income from the substantial assets owned by decedent and held for her benefit in the marital trust were more than sufficient to satisfy her relatively modest needs. Prior to 1982, decedent had made only sporadic gifts to family members in amounts less than the per donee annual gift tax exclusion under section 2503(b). In 1982, decedent's sons, Bernard and Irving, recommended to her that she begin a series of annual gifts that would take advantage of the $ 10,000 per donee annual exclusion, fulfill her interest in providing financially for the family donees during her lifetime, and reduce the estate tax liability of her estate. However, because Bernard's and Irving's families were of unequal size (Stephen and Jeffrey were then unmarried), there was a felt need to create a giving formula that both branches of the family would regard as fair. On February 4, 1982, Richard, who is an attorney and petitioner's first counsel of record in this case, sent Bernard a letter discussing how to make gifts from the property of decedent and the marital trust that would equalize the *351 interests of the two branches of the family. Richard's letter makes clear that decedent, Bernard, Irving, and Richard, who were then the trustees of the marital trust, understood that the provisions of the marital trust did not authorize gifts of trust principal during decedent's lifetime. Richard recommended that consents and indemnification agreements be obtained from decedent and the family donees, as the only persons in being who had any present or contingent right or interest in the marital trust. Although Richard advised that distributions from the marital trust without obtaining court approval would be "risk distributions" under Pennsylvania law, [1] he stated that "obtaining court approval seems wholly unnecessary and extravagant so long as the consents and indemnification are obtained." *352 In a memorandum dated June 9, 1982, Richard recommended a formula for making annual gifts from decedent's own property and from the marital trust. Under the formula, members of Bernard's family each would receive the maximum $ 10,000 annual excludable gift, whereas Irving's sons and Eiriste would receive additional amounts -- encroaching on the unified gift and estate tax credit -- that were intended to provide for the future spouses and children of Irving's sons. Bernard and Irving agreed that the formula was fair and should be implemented. They explained it to decedent, who agreed that the formula was fair and that the contemplated gift-giving program would promote family harmony and should be implemented. Richard thereupon prepared a document entitled "Direction and Consent to Distribution from Trust under the Will of Julius Halpern, Deceased" (First Consent), which provided for gifts by decedent to the family donees of 66 shares of Charles Buildings, Inc. (CBI), held in her own name and the distribution to the family donees of 74 shares of CBI held in the marital trust. On or about July 19, 1982, decedent and all the family donees (or custodians acting on their behalf) signed *353 the First Consent, and the contemplated distributions occurred in 1982. The First Consent directed the trustees to "promptly distribute gratis" the CBI shares to the family donees in specified amounts, set no conditions to the distributions, provided for no retention by decedent or any of the trustees of any power over the distributed assets, and contained the envisioned consents and indemnification agreements of decedent and all the family donees. The First Consent referred to the marital trust, the trustees' powers, the trust's intent or purpose, and the desires and circumstances of decedent and the family donees. The First Consent made no reference to other assets to be subsequently distributed from the marital trust, nor even to a general intention to make subsequent distributions from the marital trust. A timely filed United States Gift Tax Return was filed on behalf of decedent reporting as gifts all the 1982 transfers of CBI stock, both the shares held by decedent and the shares distributed from the marital trust. The pattern of giving initiated with the First Consent was continued in later years. On January 5, 1983, the same parties signed the Second Consent, under which *354 120 shares of CBI were to be distributed from the marital trust to the family donees. On June 11, 1984, the Third Consent was signed, under which 107.46 shares of common stock in Banksville, Inc., were to be distributed from the marital trust to the family donees. On or about February 1, 1985, the Fourth Consent was signed, under which 49.29 shares of common stock in Banksville, Inc., and 170.4 shares of common stock in Halpern Buildings, Inc., were to be distributed from the marital trust to the family donees. On or about January 1, 1986, the Fifth Consent was signed, under which 215.1 shares of common stock in Halpern Buildings, Inc., were to be distributed from the marital trust to the family donees. The terms of each of these Consents were in substance identical with those of the First Consent, except that each of them specified different items of property to be distributed. None of the Consents made any mention or even hint of distributions in future years. The assets that the foregoing Consents directed the trustees to distribute were in each case distributed during the remainder of the calendar year in which the Consent was signed, and the distributions were made without court *355 authorization or approval. The only Consent after the First Consent that included transfers of decedent's personal property, as well as distributions from the marital trust, was the Fourth Consent, and the amount of decedent's personal property transferred was small, only .11 shares of Banksville, Inc. stock. The Second, Third, and Fifth Consents included only property distributed from the marital trust. United States Gift Tax Returns were timely filed by or on behalf of decedent in respect of the distributions of stock from the marital trust and from decedent herself for each of the years 1983 through 1986. At an unspecified date in 1986, after the execution of the Fifth Consent, [2] decedent suffered a serious stroke; she became severely paralyzed and her speech was slurred. She remained in this state until her death on May 17, 1988. On July 17, 1986, the Court of Common Pleas of Allegheny County, Pennsylvania, Orphans' Court Division (the Orphans' Court) adjudged decedent incompetent and appointed Bernard and Irving guardians of her person and estate. On January 23, 1987, Stephen replaced decedent as trustee of the marital trust. *356 After decedent became incapacitated, distributions of trust assets continued. Although the record does not indicate whether any of the assets distributed pursuant to the Fifth Consent were distributed after her stroke, it is clear that those distributions were completed during 1986. On January 24, 1987, the Sixth Consent was executed by the same family donees, but without decedent's signature. The trustees of the marital trust signed expressly as such, which they had not done with respect to the previous Consents. Although Bernard and Irving signed the Sixth Consent individually and as trustees, the Consent expressly mentioned decedent's stroke and incompetency and stated that she was not joining in the agreement, either personally or by Bernard and Irving as her guardians. The Sixth Consent contained the same consent and indemnification provisions as the earlier Consents, with the significant difference that these provisions now lacked decedent's signature. The Sixth Consent made much the same references to the purposes of the marital trust and the family's circumstances. Pursuant to the Sixth Consent, the trustees agreed to "promptly distribute gratis" 162.5 shares of common stock *357 in Halpern Buildings, Inc., from the marital trust to the family donees. This distribution occurred during 1987. The Sixth Consent mentioned a parallel gift to the family donees of 50 shares of Halpern Buildings, Inc., held personally by decedent. Bernard and Irving, as decedent's guardians, sought and obtained the approval of the Orphans' Court for that parallel gift, which was also made during 1987. Bernard's and Irving's Petition for Approval of Gifts made no mention of distributions being made from the marital trust. However, in referring to the pattern of early lifetime gifts in which decedent had been engaged since 1981, the Petition created the impression that those gifts had been made by decedent from her own property, whereas in fact the bulk of them had been made from the marital trust without court authorization or approval. [3]
On or about January *358 21, 1988, the family donees executed the Seventh Consent, with terms identical to those of the Sixth Consent, except for two differences. First, the trustees agreed to "immediately distribute gratis" the assets in question. Second, the assets distributed from the marital trust were cash and the release of indebtedness owed to the marital trust by some of the family donees: $ 72,884.88 was to be distributed from the marital trust to certain family donees, and $ 15,000 in indebtedness to the marital trust owed by certain family donees was to be released. Finally, $ 15,000 was to be paid by the marital trust to decedent on behalf of Eileen and Nicholas J.D. Lane so as to reduce by that amount a debt that they owed to her. These distributions occurred during 1988. United States Gift (and Generation-Skipping Transfer) Tax Returns reporting all distributions from the marital trust and transfers of decedent's own property were timely filed for 1987 and 1988 on behalf of decedent. Gift tax of $ 28,998.69 was paid for the 1986 transfers, and this was the only year for which gift tax was actually paid. However, in all the other years, as well as in this one, the unified credit was appropriately *359 reduced. The 1987 and 1988 distributions under the Sixth and Seventh Consents, like the earlier distributions under decedent's prior Consents, occurred without authorization or approval of the Orphans' Court or any other court. On May 17, 1988, decedent died testate. At the time of her death, the marital trust contained cash and securities valued at $ 447,013.86, which were included in the gross estate reported by decedent's timely filed United State Estate (and Generation- Skipping Transfer) Tax Return. Decedent's total gross estate at that time (not including the amounts in dispute in this case) was reported as amounting to $ 1,631,160.03. Under the terms of her will, decedent exercised her general power of appointment over the marital trust by appointing to her estate all the property held in the marital trust. After various specific bequests and devises, decedent's residuary estate was divided in equal shares so that each surviving grandchild would receive one share and single shares would be divided among the surviving issue of deceased grandchildren. Provision was also made for spouses and living children of surviving grandchildren out of those grandchildren's single shares. *360 As a result, the pattern of distribution under decedent's will differed somewhat from the pattern of the distributions from the marital trust, but the beneficiaries were essentially the same. Decedent's will was probated in the Orphans' Court, and Bernard and Irving qualified as executors. The parties have agreed on the date-of-death values of the distributions in issue. For this purpose, the stock of Halpern Buildings, Inc., is valued at $ 1,222 per share. Stock of CBI is valued at $ 1,417.19 per share for shares distributed in 1982, and $ 1,425.87 per share for shares distributed in 1983. Stock of Banksville, Inc., is valued at $ 2,390 per share for shares distributed in 1984, and $ 2,350 per share for shares distributed in 1985. As a result, the amounts of the distributions in issue, which respondent contends are includable in decedent's gross estate, are as set forth below: Year
Amount
1982
$ 104,872.06
1983
171,104.40
1984
256,829.40
1985
325,494.00
1986
262,852.20
1987
198,575.00
1988
102,884.88
1,422,611.94
OPINION I. Preliminary Matters
A. Burden of Proof
Respondent's statutory notice of deficiency and original answer included in the gross *361 estate only distributions in 1987 and 1988 from the marital trust. The grounds stated in the statutory notice for inclusion of the 1987 and 1988 distributions were that the trustees of "decedent's marital trust, alkla [sic] power-of-appointment trust, made unauthorized transfers" therefrom. With respect to the 1987 transfers, the statutory notice specified sections 2033 [4] and 2038 as the statutory grounds for inclusion, whereas, with respect to the 1988 transfers, the statutory notice stated, without citation of statutory authority, that the transfers were made to "various relatives" and that "the source of these transfers was the trust corpus." In her amended answer, respondent sought to include in decedent's gross estate the transfers made prior to 1987 and specified as grounds for their inclusion not only sections 2033 and 2038 but also section 2041. Respondent's amended answer also added section 2041 as a statutory ground *362 for inclusion of the 1987 transfers, and with respect to the 1988 transfers, asserted that the grounds for inclusion stated in the statutory notice were sufficiently broad to encompass sections 2033, 2038, and 2041. In our order of August 16, 1993, granting respondent's motion for leave to amend answer, we assigned the burden of proof with respect to "the pre-incompetency distributions" to respondent, but said that we would not rule on the burden of proof with respect to section 2041 until we issued our opinion. However, we now deem it unnecessary to decide who has the burden with respect to section 2041 because we arrive at the same result no matter who has that burden with respect to the transfers during the years 1987 and 1988. As will appear, the burden of proof for the pre-1987 transfers does play a role in supporting an alternative rationale for our conclusion that the 1986 transfers are not included in the gross estate. Our August 16, 1993, order will be amended to make it clear that respondent has the burden of proof with respect to the 1982 through 1986 transfers, without regard to whether the 1986 transfers occurred before or after the onset of decedent's incompetency. *363 Rule 142(a). B. Respondent's Policy Argument
Respondent complains generally that excluding the marital trust distributions from decedent's gross estate as valid transfers would undermine the Federal transfer tax system. Respondent argues that allowance of the section 2056 marital deduction for the amounts passing to the marital trust under Julius' will created a Federal estate tax liability in decedent's estate that her lifetime transfers -- even if they were valid under State law -- should not be permitted to avoid. Cf. Cavenaugh v. Commissioner, 100 T.C. 407, 415-416 (1993), affd. in part and revd. in part on other grounds 51 F.3d 597 (5th Cir. 1995). In support of this broad proposition, respondent cites three of our decisions that did not allow nonadversary determinations by State courts to defeat Federal tax liabilities, Estate of Bennett v. Commissioner, 100 T.C. 42, 60 (1993); Estate of La Meres v. Commissioner, 98 T.C. 294, 311 (1992); and Estate of Nicholson v. Commissioner, 94 T.C. 666, 673 (1990). [5]
*364 Respondent's policy argument goes too far in the wrong direction. In the cited cases, the taxpayers tried to use a nonadversary proceeding in a State court to extinguish Federal tax liabilities that had already accrued upon the decedent's death. In the case at hand, the distributions were made before the decedent died and before any Federal tax liability had accrued. The Federal estate tax does not exist in isolation. There is a unified system of Federal transfer taxes on donative transmissions of wealth that is made up of the gift tax, the estate tax, and the generation-skipping transfer tax. Decedent reported the distributions from the marital trust on her gift tax returns as her own transfers, the unified credit was reduced, and some gift taxes were paid. [6] The mere fact that the unified credit was reduced by less than it might have been otherwise because of the annual gift tax exclusion for donees does not threaten the whole system; the annual exclusion is an integral part of the system as Congress has written it. [7] After all, if Julius had bequeathed the assets of the marital trust outright to decedent and she had made the transfers to the family donees herself, Julius' *365 estate would have been entitled to the marital deduction, and yet decedent's transfers clearly would not have been includable in her gross estate. *366 The question remaining is whether the distributions from the marital trust, which respondent argues contravened Julius' intent as expressed in his will, would have been upheld under Pennsylvania law if decedent or her personal representatives or any other interested party had sought legal redress. If the transfers could have been returned to the marital trust for disposition under decedent's exercise of her general power of appointment, then the transfers may be includable in decedent's gross estate. II. Inapplicability of Section 2038
Respondent argues, with apparent plausibility, that section 2038 applies, [8] both (1) to all the property in question because all the distributions were legally ineffective, so that the property therefore remained subject to decedent's general power of appointment (a power of the kind contemplated by section 2038), and (2) to the property transferred by the postincompetency distributions, because those distributions were revocable. All that section 2038(a)(1)[9] literally requires for inclusion in the gross estate of the value of property transferred is: (1) That the decedent should have transferred the interest in question (with various requirements *367 for the transfer that here are met); and (2)(a) that the enjoyment of the interest in question should be subject to a power of the decedent to alter, amend, revoke, or terminate at the time of the decedent's death; or (b) that the decedent should have relinquished such a power within 3 years of death. Except to the extent that decedent did not herself participate in the transfers in question (and she clearly did not for the 1987 and 1988 distributions), these requirements were literally satisfied. *368 However, a literal reading of section 2038(a)(1) along those lines does not wash. For it to make sense, we must interpret section 2038(a)(1) to require that the transfer of which it speaks have happened before (or at any rate not later than) the existence at death or relinquishment of the decedent's power and be from the decedent's own property. The structure of subtitle B -- Estate and Gift Taxes -- requires the contrary interpretation that sections 2038 and 2041 are mutually exclusive: sections 2035 through 2038 all concern transfers made by the decedent from the decedent's property during life. 5 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 126.1, at 126-3, par. 128.1, at 128-4 (2d ed. 1993). Section 2041 has always been taken to be the section of subtitle B that has to do with the powers of a grantee, as opposed to a grantor, as sections 2036 through 2038 have to do with the powers of a grantor. Dukeminier & Johanson, Wills, Trusts, and Estates 985 (4th ed. 1990). Sections 2036, 2037, and 2038 are all ultimately descended from the same provision in the 1916 estate tax statute that included in the gross estate any transfer by trust or otherwise *369 "intended to take effect in possession or enjoyment at or after death". Revenue Act of 1916, ch. 463, sec. 202(b), 39 Stat. 777-778; Bittker & Clark, Federal Estate and Gift Taxation 204-205, 247, 299 (6th ed. 1990). [10] *370 This ancestor subsection was held not to apply to interests subject to an exercised general power of appointment in United States v. Field, 255 U.S. 257, 264 (1921). [11] Since the predecessor of current section 2041 was extended to cover all general powers of appointment in 1942, respondent seems never to have argued until now -- and courts never to have held -- that section 2038 applies to a transfer that was not from the decedent's own property.[12] We regard respondent's insistence on amending her answer to include section 2041 as an alternative ground for her determination as a confession of lack of confidence in her section 2038 argument. For all these reasons, we hold that the mere fact that property has been transferred through the exercise or release of a general power of appointment does not make that property subject to section 2038. Because we will apply section *371 2041 in much the same way that respondent has asked us to apply section 2038, the only result of our rejecting section 2038 in the case at hand is that the distributions from the marital trust are not subject to inclusion under the within-3-years-of-death rule of sections 2035 and 2038. As a result, we end up not including in the gross estate the 1986 distributions, which occurred within 3 years of death, and the 1985 distributions, which may have occurred within 3 years of death. [13] In other respects, we find that section 2041 applies in the same way that section 2038 would have applied had decedent herself been the transferor of property to the marital trust. III. Applicability *372 of Section 2041
A. Introduction
Section 2041[14] *373 includes in the gross estate property connected in one of two ways with a general power of appointment held by the decedent. The decedent must either (i) have held such a general power of appointment over the property in question at death, or (ii) have exercised or released the power by a disposition of such nature that, if it had effected a transfer of property owned by the decedent, the property would have been includable in the decedent's gross estate under sections 2035 through 2038. For our purposes, what matters is the first requirement, whether decedent when she died held a general power of appointment over the trust assets distributed pursuant to the Consents. [15]
Respondent argues that all the distributions were ineffective, so that the property remained in the marital trust, and is therefore included in decedent's gross estate under section 2041 because she had a general power of appointment over the marital trust. [16] *374 Respondent argues in the alternative that the postincompetency distributions were revocable, like the distributions in Estate of Casey v. Commissioner, 948 F.2d 895 (4th Cir. 1991), revg. T.C. Memo. 1989-511, and therefore includable in the gross estate. [17]
B. Revocability
Respondent's strongest argument is similar to respondent's arguments in Estate of Council v. Commissioner, 65 T.C. 594 (1975), and Estate of Hartzell v. Commissioner, T.C. Memo. 1994- 576. The issue is whether the assets distributed from the marital trust during decedent's *375 lifetime remained subject to her general power of appointment because the transfers were revocable. In Estate of Council v. Commissioner, supra at 607, the issue was the includability under section 2041 of distributions from a marital trust. We had to decide under North Carolina law whether the deceased beneficiary of the trust had retained the power to appoint cash and stock after they had been distributed to others from trust principal during her life. The question we faced was not whether a State court would have determined in advance of the trustees' actions that proposed distributions would fall within the intent of the settlor's will, but whether the cash and stock actually distributed from trust principal during the beneficiary's life remained subject to her power of appointment at death. We said that to find for the Commissioner we would have to find that a State court would determine after the fact that the distributions were ineffective to remove the cash and stock from the trust principal and thus that a North Carolina court would have reversed the trustees' acts. Id. at 607, 611; see also Estate of Hartzell v. Commissioner, T.C. Memo. 1994-576 *376 (applying Ohio law). In the case at hand, we must determine, as best we can, what the highest court of Pennsylvania would hold on the same question of State law. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). In making that determination, we give "proper regard" to relevant rulings of the State's other courts and sit, in effect, as a Pennsylvania court. Id.
(1). Pre- and Postincompetency Distributions Distinguished
For the purpose of our inquiry, we distinguish between the distributions made before and after decedent's incompetency. [18]
Decedent signed the Consents up to *377 the time of her stroke. She did not sign the last two Consents, nor did her guardians Bernard and Irving sign them in their capacities as such. Bernard and Irving signed only individually and as trustees. The texts of the Sixth and Seventh Consents make clear that decedent did not join in them, either "personally or by her guardians". Petitioner has attempted to introduce evidence to the effect that Bernard and Irving consented to the last two distributions as guardians, and respondent has objected to the admission of such evidence in the face of the express statements in the Sixth and Seventh Consents, signed by Bernard and Irving individually and as trustees, that decedent was not joining the agreement, either personally or by Bernard and Irving as her guardians. Respondent cites and relies on Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Estate of Craft v. Commissioner, 68 T.C. 249, 262 (1977), affd. 608 F.2d 240 (5th Cir. 1979); and In re Conveyance of Land Belonging to the City of DuBois, 335 A.2d 352 (Pa. 1975). *378 See also Olson v. North Am. Indus. Supply, Inc., 658 A.2d 358, 362 (Pa. Super. Ct. 1995) (" When the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement."). We need not decide this evidentiary issue, because, even if we consider the evidence that petitioner has submitted, we are convinced that Bernard and Irving did not consent to the last two distributions in their capacities as guardians. Nor does petitioner persuade us that decedent effectively manifested her consent to the postincompetency distributions in any other way. [19]To establish that decedent consented to the postincompetency transfers, petitioner would have to satisfy the clear and convincing evidence standard. Hera v. McCormick, 625 A.2d 682, 689 (Pa. Super. Ct. 1993). Petitioner has not satisfied this standard.[20]
*379 Petitioner argues that all the distributions, including the last two, took place within the framework of one overarching family agreement concluded in 1982. Pennsylvania courts have inferred the existence of family agreements, in the absence of written evidence, from consistent patterns of conduct long acquiesced in. Simmers v. Simmers, 14 A.2d 120, 121 (Pa. 1940); In re Strawbridge's Estate, 185 A. 726, 727 (Pa. 1936). However, family agreements must be established by clear and unambiguous evidence, [21] and the burden of doing so is on the proponent. In re McCrea's Estate, 380 A.2d 773, 775 (Pa. 1977); In re Hammer's Estate, 132 A.2d 275, 277 (Pa. 1957); In re Brojack's Estate, 467 A.2d 1175, 1179 (Pa. Super. Ct. 1983). Here, although there is some evidence to support the view that there was one overarching family agreement, the evidence is less than persuasive by a preponderance of the evidence standard and certainly does not rise to the level of clarity and specificity that a Pennsylvania court would require. This is especially *380 true in view of the fact that none of the separate Consents makes reference to any overall plan or to any items of property besides the specific ones transferred under the Consent in question. *381 (2). Preincompetency Distributions
We conclude that the distributions from the marital trust prior to decedent's incompetency would not have been set aside under Pennsylvania law. We believe that a Pennsylvania court would have used at least one of the following rationales to refuse to set them aside because of a very significant characteristic of the case at hand that we also emphasized in Estate of Council v. Commissioner, 65 T.C. at 611: First, under Council's will the remaindermen had only a contingent interest subject to the non-exercise of decedent's power of appointment. As the decedent had the power to appoint trust principal to anyone she chose, the trustees had no obligation to any beneficiary other than decedent. Secondly, the distributions made here ultimately inured to the benefit of the remaindermen. Under these circumstances, we believe the trustees acted with due regard to the interests of all possible beneficiaries who were specifically named in Council's will. We see no material frustration of the testator's intent.
In the case at hand as well, none of the members of decedent's family had any vested right to any of *382 the trust corpus. By consenting to the advance distributions, decedent was only marginally reducing a preexisting substantial trust estate that was more than sufficient to support her relatively modest standard of living. [22] While some of the other members of the family might have received a slightly smaller percentage of the trust principal than they otherwise would have received after decedent's death, all of them received significant amounts substantially more quickly than if they had had to wait for decedent's death. Taking the time value of money into account, the family donees all benefited. There was also the transfer tax advantage to the family of avoiding gift and estate taxes on the $ 10,000 annual exclusions. Of course, decedent was afforded somewhat less protection by the trust as its corpus was distributed *383 to the family donees than the settlor Julius may have intended. In Pennsylvania, as in North Carolina, the intent of the settlor or testator, so long as it is legal, has long been said to be the "polestar" for the interpretation of trusts and wills by which courts must be guided. Estate of Council v. Commissioner, 65 T.C. at 609-610; In re Janney's Estate, 446 A.2d 1265, 1266 (Pa. 1982); In re Tracy, 346 A.2d 750, 752 (Pa. 1975); Ruston's Executors v. Ruston, 2 Dall. 243, 244 (Pa. 1796); Estate of Pew, 655 A.2d 521, 533 (Pa. Super. Ct. 1994); In re Krebs's Estate, 483 A.2d 919, 921 (Pa. Super. Ct. 1984); Busby v. Busby, 1 Dall. 226 (C.P., Phila. Co., Pa. 1787). [23]
*384 Respondent cites a line of cases in which Pennsylvania courts refused to authorize changes in or terminations of trusts because of the settlor's manifested contrary intent. In re Grote's Estate, 135 A.2d 383, 387 (Pa. 1957); In re Cannistra's Estate, 121 A.2d 157, 163-164 (Pa. 1956); In re Krebs's Estate, supra; see also In re Benson, 615 A.2d 792, 795-796 (Pa. Super. Ct. 1992). [24] However, in every one of these cases, the taxpayer sought prior authorization of the change or termination. As we said in Estate of Council v. Commissioner, supra at 607, the issue before us is not whether the State court would have authorized the distributions in advance, but whether the State court would have reversed them after the fact. *385 (a). Family Agreement Petitioner argues that the distributions in the case at hand were authorized by a family agreement, a species of agreement that is particularly favored by Pennsylvania law. Fry v. Stetson, 87 A.2d 305, 307 (Pa. 1952); In re Strawbridge's Estate, 185 A. 726, 728 (Pa. 1936). Family agreements can serve to authorize or at least immunize from suit after the fact actions otherwise in violation of law, In re Brojack's Estate, 467 A.2d 1175, 1178 (Pa. Super. Ct. 1983), and therefore -- at least in exigent circumstances -- actions in violation of trust instruments, In re Mintz's Trust, 282 A.2d 295, 302 (Pa. 1971). Family agreements construing wills are, in the absence of fraud, binding even when they are based on an error of law. Fry v. Stetson, supra.Although we have found above that the evidence is not clear enough to conclude that there was a single overarching family agreement under which the seven Consents were executed, we do agree with petitioner that the first five Consents represented family agreements *386 with respect to the assets that each of them governed. A problem is presented in determining the effectiveness of the family agreements embodied by the First through Fifth Consents with respect to minor, unborn, and unascertained members and beneficiaries. The Board of Tax Appeals held valid a new supervening trust that replaced an earlier trust under a family agreement consented to by all adult members of the family because the interests of the infant members were protected by the customary legal safeguards and because a court approved the agreement. Bullard v. Commissioner, 34 B.T.A. 243, 253 (1936), revd. on other grounds 90 F.2d 144 (7th Cir. 1937), revd. 303 U.S. 297 (1938). In the case at hand, all adult members of the family signed and consented (at least until decedent's stroke), but the minor members of the family only did so as represented through their parent/custodians, and there was no representation of unborn and unascertained beneficiaries, as there would have been in a court proceeding. Cf. In re Kenna's Estate, 34 A.2d 617, 618 (Pa. 1943). Petitioner *387 cites cases where family agreements were held valid by the Pennsylvania court of first instance over then-minor family members or guardians ad litem representing them who objected at the time or later. Hay Trust, 9 Pa. Fiduc. Rptr. 2d 1441 (Phila. Orphans' Ct. 1988); Warden Trust, 4 Pa. Fiduc. Rptr. 2d 159 (Phila. Orphans' Ct. 1984); Eisenbach Estate, 4 Pa. Fiduc. Rptr. 51 (Lackawanna Orphans' Ct. 1953). The Pennsylvania Supreme Court, however, has made that absence of approval from such parties a ground for refusing to approve actions of this kind. In re Martin's Estate, 36 A.2d 786, 788 (Pa. 1944); In re Kamerly's Estate, 35 A.2d 258, 259 (Pa. 1944); In re Rickenbach's Estate, 34 A.2d 527, 531 (Pa. 1943); In re Kenna's Estate, 34 A.2d 617, 619 (Pa. 1943). We believe that the significant distinction between the two lines of cases is the distinction between authorization before the fact and reversal after the fact emphasized in Estate of Council v. Commissioner, 65 T.C. 594 (1975). We therefore believe that the valid *388 family agreements embodied by the First through Fifth Consents were effectively concluded in each of the years from 1982 to 1986. [25]
*389 (b). Estoppel Whether or not the various family agreements would have been given effect as such, most if not all of the participants were estopped by the Consents from complaining about the distributions. Acquiescence manifested merely by a course of conduct (even when it is merely the failure to object) has been held to be sufficient reason to estop a beneficiary from complaining about actions contrary to law. In re Shipley's Estate, 12 A.2d 343, 344 (Pa. 1940). The same is all the more true of consent manifested in writing. In re Ward's Estate, 38 A.2d 50, 51 (Pa. 1944). Estoppel by consent or acquiescence is all the clearer in the case of mere breaches of trust. In re Mintz's Trust, 282 A.2d 295, 302 (Pa. 1971); Simmers v. Simmers, 14 A.2d 120, 121 (Pa. 1940); cf. Zampetti v. Cavanaugh, 176 A.2d 906, 910 (Pa. 1962). Equity will not countenance an objection by a beneficiary who has received benefits. In re Brojack's Estate, 467 A.2d 1175, 1181 (Pa. Super. Ct. 1983). Respondent argues that, *390 even if no one else could have complained about the distributions and sought legal redress, the executor or executors of decedent's estate had clean hands and could have done so. However, any right of the estate would have derived from decedent. [26] *391 If adult beneficiaries consent to the termination of a trust, no consent is needed from those who take through them. Appeal of Gannon, 631 A.2d 176, 187-188 (Pa. Super. Ct. 1993). [27] Where evidence established that the testator's grandchildren had released their claim to a trust and estate, their descendants were thereby barred from any claim. In re McKee's Estate, 108 A.2d 214, 225 (Pa. 1954). Where a son was barred by laches and acquiescence, his widow, who could only have acquired a claim through him, was barred from seeking a surcharge for the trustees' diversion of trust funds. In re Wilbur's Estate, 5 A.2d 325, 331 (Pa. 1939). Thus, there seems to have been no possibility of an enforceable claim from decedent's executor or from anyone whose claim derived from any of the family donees. (c). Release As we have seen, decedent was barred from seeking reversal of or any redress for at least the five initial distributions. In addition, she appears to have effectively released any power over or interest in the distributed assets that might have otherwise caused them to be includable in her gross estate. In Estate of Ware v. Commissioner, 480 F.2d 444, 447 (7th Cir. 1973), revg. 55 T.C. 69 (1970), the trusts established by an Illinois settlor who resigned from any association with them and who had effectively divested himself of any power over them, were *392 held not includable in his gross estate under section 2036 or section 2041, even though the trust instruments made no provision for resignation and he neither sought nor obtained court approval. The Court of Appeals so held because the settlor had satisfied the terms of the Illinois Termination of Powers Act, Ill. Rev. Stat. ch. 30, paras. 177-182, which is similar to 20 Pa. Cons. Stat. Ann. sec. 6103 (1995). [28]
*393 We believe that the requirements of 20 Pa. Cons. Stat. Ann. sec. 6103 were satisfied by the First through Fifth Consents, at least insofar as decedent's general power of appointment is concerned. Decedent signed those Consents, which were written instruments. The Consents were delivered to the trustees. Decedent's general power of appointment over the marital trust was not an imperative power that could not be released, inasmuch as Julius' will, which created the marital trust, provided for an alternative transfer under the intestate laws of the State of Pennsylvania. [29] For the tax issue in this case, it is the general power of appointment that matters, and decedent effectively released that power with respect to the assets covered by the first five Consents. *394 Inasmuch as it is only decedent's general power of appointment, as opposed to her beneficial interest and her trustee powers, that could have caused the assets in question to be included in her gross estate, we need not consider whether the Consents effectively released or disclaimed her beneficial interest and her trustee powers. Respondent argues that the Consents did not amount to releases by decedent because they contained no explicit declaration of release. While we agree that any such release by decedent was only implicit, we believe that the portion of section 6103 of 20 Pa. Cons. Stat. Ann. we are concerned with does not require an explicit declaration of release. This is in contrast with chapter 62, Disclaimers, [30] which contains a section, 20 Pa. Cons. Stat. Ann. sec. 6201 (1995), that precisely requires explicit declaration of a "disclaimer and extent thereof". In re Bernecker's Estate, 654 A.2d 246, 248 (Pa. Commw. Ct. 1995), rightly requires such explicit declaration in order for a disclaimer under 20 Pa. Cons. Stat. Ann. sec. 6201 to be valid. Moreover, 20 Pa. Cons. Stat. Ann. sec. 6103 itself requires that a release expressly so provide *395 if it is to render imperative a power that was not imperative before the release. The legislators of Pennsylvania knew how to write a requirement that a declaration of release be explicit. They did not do so in the earlier versions of 20 Pa. Cons. Stat. Ann. sec. 6103, and they still refused to do so when they amended 20 Pa. Cons. Stat. Ann. sec. 6103 in 1976 to reflect the addition of chapter 62. 20 Pa. Cons. Stat. Ann. sec. 6103, Official Comment -- 1976 and Historical and Statutory Notes (1995). [31] The release under a predecessor of 20 Pa. Cons. Stat. Ann. sec. 6103 approved in In re Jeffers's Estate, 147 A.2d 402, 403 (Pa. 1959), certainly was a much more explicit release than the Consents in the case at hand, but that case does not rely on the explicitness of the instrument for its result. The distributions dictated by the first five Consents *396 were partial terminations of the marital trust, and they therefore extinguished any powers that decedent had over as much of the trust as had been terminated. Respondent also objects that if decedent had released her power, the property should have passed pursuant to Julius' will to the default takers; i.e., Julius' heirs under the laws of intestacy of Pennsylvania. Under 20 Pa. Cons. Stat. Ann. sec. 2103 (1995), those default takers would have been the two sons of Julius and decedent, Bernard and Irving, who would each have taken a half share. But this means only that Bernard and Irving *397 had a claim to the transferred property, if they had chosen to exercise it. Instead, they were the prime movers in effectuating what they claim is the overarching family agreement. By their actions, whether or not they effectively disclaimed any interest, they are estopped from seeking that property now, just as they were estopped at all times after the distributions were made. If the first five Consents were effective partial releases by decedent, as we hold, the fisc may have transfer tax claims against Bernard and Irving, [32] but any effective connection between decedent and the trust property distributed was effectively severed, and decedent held no general power of appointment at death over the assets transferred under these Consents.
*398 (d). Appropriate Remedy Even if a Pennsylvania court were to hold that the family agreements did not supersede any of the obligations under the trust and that decedent had not effectively released any power that she had over the property distributed, we would still need to find that the Pennsylvania court would return or would have returned the property distributed or its value to the marital trust if any potential complainant had brought suit or were to bring suit. A breach of a trust does not necessarily require a remedy. The Superior Court of Pennsylvania recently found that trustees had technically breached the terms of a trust instrument by creating a share for a deceased beneficiary that was not a trust, but that since the complainants had suffered no harm, no remedy was in order. In re Benson, 615 A.2d 792, 795 (Pa. Super. Ct. 1992)
Even if it were found appropriate to grant a remedy, under the present circumstances, where virtually all imaginable potential parties had estopped themselves from seeking further advantages and where decedent had consented to the distributions, awarding damages against the trustees would be a more practical *399 way of compensating any aggrieved plaintiff.[33] *401 Beneficiaries of Pennsylvania trusts have a choice of remedies, both legal and equitable, and can choose equitable remedies even where legal remedies are available. Ramsey v. Ramsey, 41 A.2d 559, 561 (Pa. 1945); Steinmeyer v. Siebert, 42 A. 880 (Pa. 1899); American Express Travel Related Servs. Co. v. Laughlin, 623 A.2d 854, 856 (Pa. Super. Ct. 1993) (citing 1 Restatement, Trusts 2d, sec. 199, Comment a). Nevertheless, since courts hold that equitable remedies and specific performance can be granted where there is no adequate legal remedy, Peoples-Pittsburgh Trust Co. v. Saupp, 182 A. 376, 379 (Pa. 1936), and since suits for monetary damages against trustees are in any case ordinarily equitable in nature, American Express Travel Related Servs. Co. v. Laughlin, supra at 858 (Wieand, J., dissenting) (citing City of Philadelphia v. Penn Plastering Corp., 253 A.2d 247 (Pa. 1969); Ramsey v. Ramsey, supra), the fact that *400 an adequate remedy in monetary damages exists -- as it does here -- ought to inform a court's determination of remedy.[34]
*402 Given all these possible rationales for irrevocability, we conclude that a Pennsylvania court would not have returned to the marital trust the value of the amounts distributed to the family donees under at least the first four Consents. [35] Both those Consents and the distributions made pursuant to them were clearly preincompetency. We consider infra pp. 47-48 the treatment of the 1986 distributions, which were not either clearly pre- or clearly postincompetency and conclude that they would be treated identically. *403 (3). Postincompetency Distributions
We now turn to the revocability of the distributions pursuant to the Sixth and Seventh Consents, executed in 1987 and 1988 after decedent had a stroke and was adjudged incompetent. The legal position with respect to these later distributions (with respect to which the burden of proof remains with petitioner) is very different. We have not found sufficient evidence to conclude that those later distributions took place under one overarching family agreement to which decedent had consented (and under Pennsylvania law petitioner has the burden of proof on this issue as well). The single family agreements that the family donees attempted to embody in the Sixth and Seventh Consents expressly failed to include her as a party, even through her guardians. They therefore failed to be efficacious. Petitioner heavily relies on In re Ward's Estate, 38 A.2d 50 (Pa. 1944), where consent by a "weak-minded" trust beneficiary was held to prevent an action against a trustee for holding nonlegal investments. However, the beneficiary there had signed an instrument signifying consent at a time when the trial court found that she *404 was still competent. The rule stated in 1 Restatement, Trusts 2d, sec. 216, Consent of Beneficiary (1959), allows beneficiaries to proceed against trustees for breach of trust where the beneficiary was under an incapacity. Therefore, decedent would not have been estopped from seeking the reversal of these latter two distributions made pursuant to the Sixth and Seventh Consents. Those Consents cannot have released her interests and powers under 20 Pa. Cons. Stat. Ann. sec. 6103, inasmuch as that statutory provision requires the signature of a releasing party to a written instrument. Finally, decedent's family failed to follow the formalities (requiring application to the Orphans' Court) provided by 20 Pa. Cons. Stat. Ann. sec. 5536 (1995) for distributing the property of an incompetent. Thus, of the four rationales that we have considered under which a Pennsylvania court would have refused to reverse the preincompetency distributions, three (family agreement, estoppel, and release) are unavailable for the postincompetency distributions, and only the question of the appropriate remedy remains. We believe that a Pennsylvania court would not have used the appropriate-remedy or any other *405 rationale to refuse to reverse the postincompetency distributions because it would not have had the same policy rationale for doing so that we have discussed supra p. 28, quoting Estate of Council v. Commissioner, 65 T.C. 594 (1975), in connection with the preincompetency distributions. For the postincompetency distributions, it was not true -- as it was true for the preincompetency distributions -- that all the interested parties had consented. Rather, decedent had not consented to the postincompetency distributions. Consequently, returning these distributions to her power would have been found by a Pennsylvania court to be an appropriate remedy. Even though this record does not suggest any improper motives or overreaching on the part of any of the family donees, distributions and transfers of assets in which an incompetent has an interest present a clear risk of abuse and self-dealing, and any court would be reluctant to establish a precedent that would make it easier to take advantage of incompetent old people. See Estate of Casey v. Commissioner, 948 F.2d 895 (4th Cir. 1991), revg. T.C. Memo. 1989-511; *406 Covey, 1992 Institute on Estate Planning, par. 144, at I-355. We conclude, based on all these considerations, that decedent would have prevailed in a Pennsylvania court if the reversal of the last two distributions had been sought by her or on her behalf. [36]
*407 We hold that the last two distributions ($ 198,575 for 1987 and $ 102,884.88 for 1988) must be included in decedent's gross estate under section 2041. Cf. Estate of Council v. Commissioner, supra; Estate of Hartzell v. Commissioner, T.C. Memo. 1994-576. (4). 1986 Distributions
The Fifth Consent was executed on or about January 1, 1986. Pursuant to that Consent, property was distributed from the marital trust at some time during that calendar year. It is unclear whether the distribution was completed before decedent was adjudged incompetent on July 17, 1986. However, the fact that the Fifth Consent directs the trustees to "promptly distribute gratis" the assets in question persuades us that the distributions more likely than not occurred before decedent's incompetency. In any event, the burden of proof decides the issue for petitioner. Not until her amended answer did respondent raise the matter of the distributions made in years prior to 1987. We therefore ruled in our order of August 16, 1993, that respondent bears the burden of proof on the inclusion in the gross estate of the preincompetency distributions *408 from the marital trust. Rule 142(a). We are now amending that order to clarify that the burden of proof is on respondent for all distributions before 1987, irrespective of whether they were made before decedent's incompetency. Inasmuch as respondent has not shown that the 1986 distributions occurred after decedent became incompetent, no assets distributed during 1986 are to be included in decedent's gross estate. C. Relinquishment of Power Within 3 Years of Death
There is one last possible ground for inclusion of the 1986 transfers under the Fifth Consent that we should address: that they occurred within 3 years of decedent's death in 1988. Section 2035(d)(2) has the effect of providing, with respect to transfers of interests in property that are "included in the value of the gross estate under section 2036, 2037, 2038, or 2042 or would have been included under any of such sections if such interest had been retained by the decedent", if such transfer or release occurs within 3 years of the decedent's death, that the value of those interests is included in the decedent's gross estate. In Estate of Jalkut v. Commissioner, 96 T.C. 675, 683-684 (1991), *409 we held that this provision, in conjunction with section 2038(a), means that transfers that amount to the relinquishment of a section 2038 power are included in a decedent's gross estate if they occur within 3 years of death. However, as we have seen supra pp. 17-21, section 2038 does not apply to the distributions in the case at hand. Section 2041 also contains language that might be taken to mean that the release of powers of appointment within 3 years of death makes includable in gross estates property subject to those powers. Sec. 2041(a)(2). However, in view of the deliberate excision by the Technical Corrections Act of 1982, Pub. L. 97-448, sec. 104(d)(2)(B), 96 Stat. 2365, 2383, of section 2041 from the original list in section 2035(d)(2) (in the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 424(a), 95 Stat. 172, 317) of sections to which the 3-year inclusion was still applicable, the better view is that section 2041 makes transfers made less than 3 years before death includable only where the decedent died before 1982. 5 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 126.4.2 n.14, at 126-33; par. 128.3.3, at 128-21 (2d ed. 1993); Stephens *410 et al., Federal Estate and Gift Taxation, par. 4.0712][a], at 4-123 n.17, pars. 4.13[7][b]-[c], at 4-328 to 4-329 (6th ed. 1991). We hold that only the 1987 and 1988 distributions are included in decedent's gross estate. To reflect the foregoing and the parties' concessions, Decision will be entered under Rule 155. Footnotes
1. Under 20 Pa. Cons. Stat. Ann. sec. 3532 (1995), personal representatives may make distributions from estates at their own risk in advance of an accounting and order of the court. In re Wallis's Estate, 218 A.2d 732, 735 (Pa. 1966); 2 Partridge & Remick, Practice and Procedure in the Orphans' Court of Pennsylvania, sec. 14.10, at 192-194 (1961). Heaney v. Riddle, 23 A.2d 456, 459 (Pa. 1942), holding that a dissolved corporation's liquidating trustees who distribute funds in their hands without accounting and audit do so at the risk of being held responsible for payments made without court approval if they turn out to have been improper, also makes allowance for at-risk distributions by trustees of personal trusts. "A rule applicable to the administration of every trust is that any departure from the ordinary course is at the trustee's risk." In re Noble's Estate, 35 A. 859, 860 (Pa. 1896) (citing affirmed decision below of Orphans' Court, Allegheny County); see also 7 Pa. Cons. Stat. Ann. sec. 6351(1) (1995) (fiduciaries include trustees); 20 Pa. Cons. Stat. Ann. sec. 7183 (1995) (trustees bound by reporting requirements of 20 Pa. Cons. Stat. Ann. sec 3532(c) (1995) for risk distributions); In re Free's Estate, 194 A. 492, 495 (Pa. 1937) (executor held to be in position of trustee); In re White's Estate, 185 A. 589, 591↩ (Pa. 1936) (administrator of estate).
2. The stroke occurred between Jan. 1, 1986, when the Fifth Consent was executed, and May 30, 1986, when Bernard and Irving signed their Acceptances to appointment as guardian.↩
3. Respondent has not sought and does not seek the inclusion in the gross estate of this gift or of any of the previous gifts made from decedent's own property.↩
4. We explain infra↩ note 8 why we treat the sec. 2033 issue as conceded by respondent.
5. See also Estate of Bond v. Commissioner, 104 T.C. 652, 657 n.3 (1995), and Estate of Williams v. Commissioner, 103 T.C. 451↩ (1994), along the same lines.
6. The situation in the case at hand is different from Estate of Alperstein v. Commissioner, 613 F.2d 1213, 1218 (2d Cir. 1979), affg. 71 T.C. 351 (1978), in which the Court of Appeals for the Second Circuit refused to exclude from the decedent's gross estate an interest subject to her testamentary general power of appointment that she was never able to exercise because of incompetency. That court feared that a loophole would be created if a transfer were exempted from taxation at the first spouse's death pursuant to the marital deduction of sec. 2056 and at the second spouse's death under sec. 2041 because that spouse was then incompetent. In Estate of Alperstein↩, unlike the case at hand, there would have been no opportunity to impose the gift tax.
7. "So long as assets do not escape taxation entirely and no specific provision of the Code is contravened, taxpayers are generally permitted to arrange their affairs to minimize estate tax liability." Estate of Rolin v. Commissioner, 588 F.2d 368, 370-371 (2d Cir. 1978), affg. 68 T.C. 919↩ (1977). See generally Cooper, A Voluntary Tax? 38-40 (1979).
8. This is in contrast to respondent's failure to argue on brief for inclusion under sec. 2033. This failure leads us to treat the sec. 2033 issue as conceded to petitioner.↩
9. In relevant part, sec. 2038 reads as follows: SEC. 2038. REVOCABLE TRANSFERS. (a) In General. -- The value of the gross estate shall include the value of all property -- (1) Transfers after June 22, 1936. -- To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.↩
10. The omission of a provision for general powers of appointment was quickly repaired, but in a different subsection. Revenue Act of 1918, ch. 18, sec. 402(e), 40 Stat. 1097-1098; Bittker & Clark, Federal Estate and Gift Taxation 383 (6th ed. 1990). The powers covered by the current secs. 2036-2038 remained in a separate ancestor subsection, sec. 402(c). It is interesting to note that sec. 202(b) of the Revenue Act of 1916, ch. 463, 39 Stat. 777-778, and sec. 402(c) of the Revenue Act of 1918, 40 Stat. 1097, while they did not cover general powers of appointment, did cover transfers made "in contemplation of death", the ancestor of the current sec. 2035. Bittker & Clark, Federal Estate and Gift Taxation 195-196 (6th ed. 1990). Subsecs. (c) and (e) of sec. 402 of the Revenue Act of 1918 were separated by subsec. (d) on joint interests (already present in the Revenue Act of 1916 as sec. 202(c)), just as secs. 2035-2038 (now joined by sec. 2039 on annuities, a new kind of transfer from the grantor) are now separated from sec. 2041 by the current section on joint interests, sec. 2040. All of this supports the view that the subject matters of secs. 2038 and 2041↩ are mutually exclusive.
11. The issue of whether it would also apply to an unexercised power of appointment seems never to have arisen, which is to be expected, inasmuch as the tainted transfer presupposed by sec. 2038↩ would presumably not arise without the exercise of the power.
12. The Commissioner has on one occasion, in Ellis v. United States, 280 F. Supp. 786, 788 (D. Md. 1968), argued in the alternative for the application of sec. 2036 (pertaining to interests with retained life estate) to part of a trust established by the decedent's grandmother in which the decedent had a life estate and the general power of appointment over which decedent had released (partially, but sufficiently for sec. 2041). The Commissioner's first argument in that case was for the application of sec. 2033. The court properly rejected both arguments. "The provisions of § 2041 as to partial release would be rendered meaningless if a general power of appointment that had been properly limited could be taxed under § 2033 or § 2036." Id.↩ at 795.
13. Although the Fourth Consent, for 1985, was signed on Feb. 1, 1985, well outside the 3-year limit, we do not know whether the distributions were completed by May 17, 1985, the date 3 years before decedent's death. Since we end up deciding that sec. 2038↩ and the 3-year rule do not apply, we do not discuss this potential problem further.
14. In relevant part, section 2041 reads as follows: SECTION 2041. POWERS OF APPOINTMENT. (a) In General. -- The value of the gross estate shall include the value of all property -- * * * (2) POWERS CREATED AFTER OCTOBER 21, 1942. -- To the extent of any property with respect to which the decedent has at the time of his death a general power of appointment created after October 21, 1942, or with respect to which the decedent has at any time exercised or released such a power of appointment by a disposition which is of such nature that if it were a transfer of property owned by the decedent, such property would be includible in the decedent's gross estate under sections 2035 to 2038↩, inclusive. * * * [Emphasis added.]
15. We consider infra↩ pp. 48-49 the only way in which the second requirement, (ii), could possibly apply, i.e., because distributions were made within 3 years of decedent's death, and conclude that it does not apply to the case at hand.
16. Respondent also argues that they were includable under sec. 2038 because decedent had the power at death to alter, amend, revoke, or terminate the marital trust. This argument fails because, as we have found, sec. 2038↩ does not apply.
17. Estate of Casey v. Commissioner, 948 F.2d 895 (4th Cir. 1991), revg. T.C. Memo. 1989-511, was a sec. 2038 case (as was the more recent and analogous Townsend v. United States, Daily Tax Rept., Apr. 20, 1995, at K-1 (D. Neb. Mar. 16, 1995)), and respondent makes this argument about revocability under sec. 2038. However, it is just as applicable to sec. 2041, as shown by Estate of Council v. Commissioner, 65 T.C. 594 (1975), and Estate of Hartzell v. Commissioner, T.C. Memo. 1994-576. Because we have found that sec. 2038 does not apply to the case at hand, we consider respondent's revocability argument in terms of sec. 2041↩.
18. In this section, we assume that all the distributions made under the first five Consents were made before decedent's incompetency, and that the distributions made under the Sixth and Seventh Consents were made after her incompetency. We consider infra↩ pp. 47-48 the possibility that the distributions under the Fifth Consent may have been made, in whole or in part, after her incompetency.
19. Bernard at trial testified that decedent could and did manifest approval of the financial arrangements that were made during her incapacitation. We are not persuaded.↩
20. On the Pennsylvania standard of clear and convincing evidence, see infra↩ note 21.
21. We interpret this standard to be the equivalent of a "clear and convincing evidence" standard (as does Packel & Poulin, Pennsylvania Evidence, sec. 303.2, at 62-63 n.16 (1987)). Clear and convincing evidence is a standard used elsewhere in Pennsylvania inheritance and property law. For example, claims of an inter vivos gift must be supported by clear and convincing evidence. In re Evans's Estate, 356 A.2d 778, 781 (Pa. 1976); Herr's Appeal, 5 Watts & Serg. 494, 499 (Pa. 1843) (Gibson, C.J.); Hera v. McCormick, 625 A.2d 682, 686 (Pa. Super. Ct. 1993); see also 20 Pa. Cons. Stat. Ann. secs. 2107(c), 5511, 5512.2(b), 5513, 6303, 6304 (1995) (wording added in every case in 1976 or later); Lessner v. Rubinson, 592 A.2d 678, 679-681 (Pa. 1991); Estate of Reichel, 400 A.2d 1268, 1270 (Pa. 1979); In re Sayre's Estate, 279 A.2d 51, 52-53 (Pa. 1971); Estate of Lakatosh, 656 A.2d 378, 383 (Pa. Super. Ct. 1995); In re Agostini's Estate, 457 A.2d 861, 869 (Pa. Super. Ct. 1983). This standard is elsewhere called "evidence of clear and unambiguous language or conduct", In re Tippins's Estate, 408 A.2d 1377, 1379 (Pa. 1979), and "clear, precise, direct and convincing evidence", In re Chiara's Estate, 359 A.2d 756, 758-759 (Pa. 1976); see also In re Irrevocable Inter Vivos Trust Agreement of Hanley, 452 A.2d 1360, 1371 (Pa. Super. Ct. 1982) (Johnson, J., dissenting), affd. sub nom. Siebert v. Bird, 468 A.2d 1093 (Pa. 1983). The Supreme Court of Pennsylvania has characterized clear and convincing evidence as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994); see also In re Fiori, 652 A.2d 1350, 1356 (Pa. Super. Ct. 1995) (citing Packel & Poulin, supra↩ sec. 303.2).
22. As we have seen, after her death decedent's gross estate was reported as amounting to $ 1,631,160.03. When she died at age 91, her life expectancy was 5.4 years. Sec. 1.72-9, Table I, Income Tax Regs.↩
23. The polestar metaphor, which we have first seen attested in Busby v. Busby, 1 Dall. 226 (C.P., Phila. Co., Pa. 1787), is said to come from Sir Edward Coke (e.g., Johnson v. Atchinson, 106 N.W.2d 748, 750 (Mich. 1961)). Notable early American uses of the phrase are in Inglis v. Trustees of the Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 144 (1830) (Story, J., dissenting); Finlay v. King's Lessee, 28 U.S. 346, 393 (1830) (Johnson, J., dissenting); and Smith v. Bell, 31 U.S. (6 Pet.) 68, 79 (1832) (Marshall↩, C.J.).
24. Judicial opinions continue to recite the standard statement about the primary of the settlor's intent (as well as the polestar maxim). It appears, however, in Pennsylvania as in other jurisdictions, that this intent is no longer being enforced with the fervor in favor of the settlor's intent that obtained at the turn of the last century. Schreiber v. Kellogg, 50 F.3d 264, 272 (3d Cir. 1995). On the changes in the ideological presuppositions underlying these developments in the law of trusts, compare Fellows, "Spendthrift Trusts: Roots and Relevance for Twenty-First Century Planning", 50 Rec. A.B. City N.Y. 140 (1995), and Alexander, "The Dead Hand and the Law of Trusts in the Nineteenth Century", 37 Stan. L. Rev. 1189 (1985). Pennsylvania pioneered in the law of the spendthrift trust, Fellows, supra at 150; Schreiber v. Kellogg, supra at 272, with the term "spendthrift trust" first attested in the syllabus of Ashhurst's Appeal, 77 Pa. 464 (Pa. 1875), and the idea being said to have originated in Fisher v. Taylor, 2 Rawle 33 (Pa. 1829). Six of the ten cases that the U.S. Supreme Court cited in giving the signal to State courts to start authorizing spendthrift trusts in Nichols v. Eaton, 91 U.S. 716, 727-729 (1875) (State statutes permitting spendthrift trusts had already been upheld, although with obvious distaste, in Nichols v. Levy, 72 U.S. (5 Wall.) 433, 444 (1866)), were Pennsylvania cases dating from 1829 through 1864. We are now at what is probably the height of courts' reaction to decisions upholding the settlor's intent, and that is as true in Pennsylvania as in other jurisdictions. For example, Pennsylvania now takes an expansive view of attorneys' powers under durable powers of attorney. Estate of Reifsneider, 610 A.2d 958↩ (Pa. 1992). We conclude that a Pennsylvania court would not be quite as insistent on upholding the settlor's intent as expressed in the trust instrument as it would have been 50 or 100 years ago.
25. A further problem is presented by the fact that even though departure from the terms of a trust instrument through a family agreement has been approved by the Supreme Court of Pennsylvania, In re Mintz's Trust, 282 A.2d 295, 302 (Pa. 1971), the earlier law that a family agreement cannot be used to violate the terms of a testamentary trust may well remain valid, In re Martin's Estate, 36 A.2d 786, 788 (Pa. 1944); In re Stewart's Estate, 98 A. 569, 570 (Pa. 1916). It may be that the departure from this previous law in In re Mintz's Trust, supra, was conditioned by the exigent circumstances there (the stock that the trustees might have been held to be obliged to acquire was of dubious value and a steady income needed for the beneficiary), and that in other circumstances the old law continues unimpaired. A lower Pennsylvania court has recently cited In re Martin's Estate, supra, with approval in holding against the taxpayer on a State inheritance tax issue. In re Hansell's Estate, 565 A.2d 844, 846↩ n.8 (Pa. Commw. Ct. 1990).
26. 20 Pa. Cons. Stat. Ann. sec. 3373 (1995) reads: SEC. 3373. ACTION BY OR AGAINST PERSONAL REPRESENTATIVE. An action or proceeding to enforce any right or liability which survives a decedent may be brought by or against his personal representative alone or with other parties as though the decedent were alive↩. [Emphasis added.]
27. As Appeal of Gannon, 631 A.2d 176, 188 (Pa. Super. Ct. 1993), illustrates, Pennsylvania now has a statutory provision for the termination (including partial termination) of a trust; it does not require unanimity but does require notice to and representation of all interested parties in a court proceeding. 20 Pa. Cons. Stat. Ann. sec. 6102↩ (1995). The members of the Halpern family chose not to seek court authorization under this provision.
28. 20 Pa. Cons. Stat. Ann. sec. 6103 (1995) reads as follows: SECTION 6103. RELEASE OR DISCLAIMER OF POWERS OR INTERESTS. (a) POWERS AND INTERESTS RELEASABLE. -- Any power of appointment, or power of consumption, whether general or special, other than a power in trust which is imperative, and any interest in, to, or over real or personal property held or owned outright, or in trust, or in any other manner which is reserved or given to any person by deed, will or otherwise, and irrespective of any limitation of such power or interest by virtue of any restriction in the nature of a so-called spendthrift trust provision, or similar provision, may be released or disclaimed, either with or without consideration by written instrument signed by the person possessing the power or the interest and delivered as hereinafter provided, but nothing in this section shall authorize an income beneficiary of a spendthrift trust to release or disclaim his right to such income, unless as a result of the release or disclaimer the released or disclaimed income will pass to one or more of the beneficiary's descendants. This section shall not apply to an interest that may be disclaimed under Chapter 62 (relating to disclaimers). (b) FORM OF RELEASE OR DISCLAIMER. -- A power or interest which is releasable or disclaimable may be released or disclaimed either absolutely or conditionally, and may also be released or disclaimed with respect to the whole or any part of the property subject to such power or interest, and may also be released or disclaimed in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power or interest would otherwise be exercisable. No release or disclaimer of a power or of an interest shall be deemed to make imperative a power or interest which was not imperative prior to such release or disclaimer unless the instrument of release or disclaimer expressly so provides. (c) DELIVERY OF RELEASE OR DISCLAIMER. -- Such release or disclaimer may be delivered to any one of the following: (1) Any person specified for such purpose in the instrument creating the power or interest. (2) Any trustee of the property to which the power or interest relates. (3) The clerk of the court having jurisdiction of the trust for filing in said court. (4) The recorder of deeds for recording in the county in which the person possessing the power or interest resides, or in which the deed, will, or other instrument creating the power or interest is recorded or filed. (d) GRANTEE OR LIENHOLDER. -- A release or disclaimer shall be void as against a bona fide grantee of or holder of a lien on real estate in any county unless the release or disclaimer or a duplicate original or certified copy thereof is recorded in the county where the real estate lies before the recording or entering of the instrument or lien under which such grantee or lienholder claims.↩
29. There is an absence of case law in Pennsylvania on when trust powers are imperative. However, it has been held in New York that where an alternative is provided by a grantor on the failure of a donee to exercise a power of appointment and apparently also when the duty is only to himself, the power is not imperative. Application of Schlussel, 89 N.Y.S.2d 47, 52 (Sup. Ct. 1949); cf. In re Sidebottom's Estate, 327 S.W.2d 270, 276 (Mo. 1959); In re Fabbri's Will, 152 N.Y.S.2d 100, 101 (App. Div. 1956), revd. on other grounds 159 N.Y.S.2d 184 (N.Y. 1957); In re Seidman's Will, 389 N.Y.S.2d 729, 732 (Sur. Ct. 1976). It has also been held in New York that general powers of appointment are never imperative. Merrill v. Lynch, 13 N.Y.S.2d 514, 525↩ (Sup. Ct. 1939).
30. Ch. 62 does not apply to decedent's general power of appointment, as it only applies to interests not yet in existence, and not to powers.↩
31. 20 Pa. Cons. Stat. Ann. sec. 6103 (1995) originally entered the Pennsylvania Code as 68 Pa. Cons. Stat. Ann. secs. 581-584↩ on May 28, 1943, and at that time only concerned powers of appointment. It was amended on June 1, 1945, Apr. 24, 1947, Feb. 17, 1956, June 30, 1972, Dec. 10, 1974, and July 9, 1976. This last amendment, of July 9, 1976, was made by Pub. L. 562, No. 136, the same law that added ch. 62 to the Pennsylvania Code.
32. Under sec. 25.2511-1(c)(2), Gift Tax Regs., as interpreted by Jewett v. Commissioner, 455 U.S. 305, 310 (1982), and United States v. Irvine,     U.S.    ,    , 114 S. Ct. 1473, 1481-1482↩ (1994) (or rather under sec. 2518, since their interests would have been created after 1976 and that section would therefore apply), they may not have effectively disclaimed their interests, insofar as Federal transfer tax is concerned.
33. Moreover, the fact that some hypothetical third party might have a case should not affect petitioner's tax liabilities. McCann v. Commissioner, 87 F.2d 275, 276 (6th Cir. 1937), revg. and remanding 30 B.T.A. 102 (1934), held that just because a creditor might have had a cause of action against a wife for the value of an amount that she had transferred back to her husband, that did not support the inclusion of that value in her gross estate. More recently, Estate of O'Daniel v. United States, 6 F.3d 321, 327 (5th Cir. 1993), held that the Internal Revenue Service, as a third party, could not assert the statute of frauds to declare void an oral contract that was unenforceable under the Arkansas statute of frauds and thereby include certain life insurance policies in the decedent's gross estate. In addition, there is the problem that a suit by such a third party is so extremely improbable under the circumstances. Petitioner appropriately cites the requirement of Estate of Tully v. Commissioner, 208 Ct. Cl. 596, 528 F.2d 1401, 1405 (1976), that a sec. 2038(a)(1) power be demonstrable, real, apparent, and evident↩, rather than speculative.
34. When the Supreme Court of Pennsylvania held that the defendants in Heaney v. Riddle, 23 A.2d 456, 458 (Pa. 1942), were in the position of trustees, that by making distributions without court authorization they put themselves at risk of being held responsible for payments made without authorization if those payments turned out to be improper, and that the payments in the case were improper in the sense in question, it merely affirmed the award of a money judgment to the plaintiff. In In re White's Estate, 185 A. 589 (Pa. 1936), the estate sought to have the property in question reconveyed to itself, but only a surcharge was awarded. In In re Free's Estate, 194 A. 492 (Pa. 1937), and in In re Shahan, 631 A.2d 1298 (Pa. Super. Ct. 1993), the only remedy considered was money to be awarded as a surcharge to the claimant. Trustees can be surcharged for acting improvidently or ultra vires, whereas setting aside is arguably restricted to cases of fraud, accident, and mistake. 20 Pa. Cons. Stat. Ann. sec. 3360(a) (1995); In re Samson's Trust,     A.2d    ,     (Pa. Super. Ct., June 7, 1995). The sale that was set aside in the case that respondent cites, In re Noonan's Estate, 63 A.2d 80, 84-85 (Pa. 1949), was of real estate, an area in which the courts are particularly inclined to enforce specific performance and equitable remedies. Likewise, the specific property which the trustees are ordered to convey in accordance with the terms of a will in Estate of Battles, 108 A.2d 688, 691 (Pa. 1954), is the Webster Home, a piece of real property. A plaintiff suing in an action over alleged mismanagement of a trust fund never has the right to a particular remedy. An Orphans' Court may choose from the variety of available remedies -- including surcharge, injunction, and removal of trustees -- the remedy it considers most appropriate to effect an equitable result. In re Francis Edward McGillick Found., 594 A.2d 322, 331 (Pa. Super. Ct. 1991), affd. in part and revd. in part on other grounds 642 A.2d 467 (Pa. 1994). The U.S. Supreme Court, in the era preceding Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), held that when a trustee abuses his trust the beneficiary has the option of seeking either an equitable remedy (the recovery of the original property or of substituted property) or a legal remedy (the value of the property in money). May v. LeClaire, 78 U.S. (11 Wall.) 217, 236 (1870); Oliver v. Piatt, 44 U.S. (3 How.) 333, 401 (1845) (Story, J.); Craig v. Leslie, 16 U.S. (3 Wheat.) 563, 582↩ (1818).
35. Because we hold that decedent released her general power of appointment with respect to the property distributed pursuant to these Consents, it follows that the transfers were subject to the Federal gift tax under sec. 2514(b), and in fact they were so reported. This supports -- although it does not require -- the conclusion that the value of the transfers is not includable in the gross estate. 5 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 126.3.6, at 126-27 (2d ed. 1993).↩
36. The lack of likelihood, because of decendent's incompetency, that she would have tried to reverse the trustees' actions no more prevents us from concluding that the last two distributions were revocable, and that she therefore had a general power of appointment over the subject assets under sec. 2041, than it prevents the general conclusion that general powers of appointment survive incompetency. Boeving v. United States, 650 F.2d 493, 494-495 (8th Cir. 1981); Estate of Alperstein v. Commissioner, 613 F.2d 1213, 1221-1222 (2d Cir. 1979), affg. 71 T.C. 351 (1978); Pennsylvania Bank & Trust Co. v. United States, 597 F.2d 382, 383-384↩ (3d Cir. 1979).